## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TARA L. LONG and TODD J. LONG, Administrators of the Estate of TAMMY E. LONG, Deceased, | : : : : | |
| Plaintiffs, | : : | Civil Action No._____ |
| v. | : : | **COMPLAINT IN CIVIL ACTION** |
| ARMSTRONG COUNTY d/b/a ARMSTRONG COUNTY JAIL and DAVID HOGUE, | : : : : | |
| Defendants. | : : | Filed on behalf of: Plaintiffs |

Counsel of Record for this Party:

George M. Kontos, Esquire
PA I.D. No. 62712
Katie A. Killion, Esquire
PA I.D. No. 205203
KONTOS MENGINE LAW GROUP
603 Stanwix Street
Two Gateway Center, Suite 1228
Pittsburgh, PA 15222
(412) 709-6162
(412) 904-3820/facsimile
gkontos@kontosmengine.com
kkillion@kontosmengine.com

**JURY TRIAL DEMANDED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TARA L. LONG and TODD J. LONG,
Administrators of the Estate of
TAMMY E. LONG, Deceased                         Civil Action No._____
                    Plaintiffs,

         v.

ARMSTRONG COUNTY d/b/a
ARMSTRONG COUNTY JAIL and
DAVID HOGUE,

          Defendants.

### COMPLAINT IN CIVIL ACTION

     AND NOW come the Plaintiffs, TARA L. LONG and TODD J. LONG, Administrators of

the Estate of TAMMY E. LONG, deceased, by and through their attorneys, George M. Kontos,

Esquire, Katie A. Killion, Esquire, and KONTOS MENGINE LAW GROUP, and file the

following Complaint in Civil Action:

### Parties and Scope

     1.     Plaintiff, Tara L. Long, is an adult individual who has been appointed Co-

Administrator of the Estate of Tammy E. Long, Deceased (hereinafter sometimes referred to as

"Tammy" and/or "Tammy Long") by the Register of Wills of Armstrong County, Pennsylvania.

She has an address at 116 Rebecca Street, Kittanning, PA 16201.

     2.     Plaintiff, Todd J. Long, is an adult individual who has been appointed Co-

Administrator of the Estate of Tammy E. Long, deceased, by the Register of Wills of Armstrong

County, Pennsylvania.  He has an address at 1586 Johnston Avenue, Kittanning, PA 16201.

3.      Plaintiffs' decedent, Tammy E. Long, was born on May 14, 1960 and died on July 30, 2015. She had an address at 110 Rayburn Rd., Kittanning, PA 16201.

4.      Defendant, Armstrong County, is a municipality and exists pursuant to the laws of the Commonwealth of Pennsylvania.

5.      Upon information and belief, Armstrong County owned, possessed, was in control of, and/or was responsible for the operation of the Armstrong County Jail (hereinafter sometimes referred to as the "Jail"). The Jail is located at 171 Staleys Courts Rd., Kittanning, PA 16201.

6.      The Jail is located among a residential community. Tammy Long resided within a quarter mile of the Jail, being able to see the Jail from the front porch of her home.

7.      At all relevant times hereto, and upon information and belief, Plaintiffs aver that Defendant David Hogue was an agent of Armstrong County and the Armstrong County Jail, acting in the course and scope of his employment, and was engaged in the performance of his duties as the Warden for the Armstrong County Jail. David Hogue, as Warden, was responsible for the implementation and promulgation of the policies of said Jail, and was responsible for the training, conduct, and supervision of all Jail personnel.

## Jurisdiction and Venue

8.      Jurisdiction is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 USC § 1331 (Federal Question).

9.      The right to bring these actions is conferred upon the Plaintiffs by virtue of the operation of the following laws:

    a. Provisions of the Wrongful Death Act, 42 Pa. C.S.A. §8301, and amendments thereto;

    b. Provisions of the Survival Act, 42 Pa. C.S.A. §8302, and amendments thereto;

    c. Provisions under 42 U.S.C. § 1983 et al. for deprivation of rights, and

2

amendments thereto; and,

    d.   All other applicable Wrongful Death Acts, Survival Acts, Fiduciary Acts, Statutes and Pennsylvania Rules of Civil Procedure.

10.     This action is brought to recover damages for and on behalf of:

    a.   Tara Long, daughter; and,

    b.   Todd Long, Son.

11.     Plaintiffs' decedent did not previously bring an action against the Defendants for damages during her life for the injuries which ultimately resulted in her death.

12.     No other action for wrongful death of Plaintiffs' decedent or for damages for the injuries causing Plaintiffs' decedent's death have been commenced against Defendants other than this action.

13.     At all relevant times hereto, the Defendants acted through their agents and employees acting within the course and scope of their agency and/or employment.

### Robert Crissman's Incarceration

14.     Robert Edward Crissman, Jr. (hereinafter, "Crissman") was a known drug user who also had record of significant criminal behavior which included multiple instances of theft, criminal trespassing, breaking and entering, driving under the influence, and use/possession of drugs and drug paraphernalia.

15.     Starting in 2003, Crissman was arrested numerous times for the above-stated criminal actions. He served several lengthy stints at the Armstrong County Jail and was often sentenced to probationary periods. On numerous occasions, Crissman violated the conditions of his parole. Many of his arrests were related to hard drug use, all of which were known to Defendants.

16.     Crissman was confined to the Armstrong County Jail on July 23, 2015 for violating

3

his parole stemming from an earlier arrest and criminal disposition.

17.    Despite the fact that Crissman had a long standing history of drug abuse, he was not drug tested at any time during his incarceration.

### The Jail's Trustee Program

18.    The Armstrong County Jail utilized a type of inmate work release program whereby inmates were assigned tasks, such as laundry, cleaning and maintaining the exterior of the facility. Such inmates were often referred to as Trustees and are thus referred to as such in this Complaint.

19.    Trustees were housed in special units and given outside privileges, which allowed workers the freedom to be outside of the Jail's confinements.

20.    Originally, the Trustee program was to be limited to only those inmates who were incarcerated for DUIs or Child Support payment violations.

21.    Trustees working outside of the Jail, even on Jail premises, did not have a guard from the Jail accompanying them. Observation of the inmates' actions in these instances was merely done via security camera.

22.    One of the jobs a Trustee could hold at the Jail was "tray duty." Trustees who were assigned tray duty were to proceed through the kitchen, and then outside to wait for a van to deliver meals on trays. These Trustees were typically not escorted by a corrections officer. Once outside, Trustees would often prop an exterior door open with a large brick while they waited for a van to deliver meals.

23.    At all times relevant hereto, inmates with Trustee status were representatives of the Jail itself, as the Jail had direct control over their actions and interaction with the community at large. As such, Trustees, like Crissman, acted with the special privileges and rights conferred upon them by the Jail, with the understanding that they had been properly vetted and screened in such manner as to not present a heightened risk to the community at large, and more specifically, to

4

those members of the community such as Tammy Long, who resided so close to the Jail.

24.     Crissman was granted Trustee status on July 29, 2015 without going through any probationary period beforehand, nor having any meaningful screening performed by the Jail.

25.     Crissman then made a request that he be assigned to tray duty. On July 30, 2015 Crissman's request was granted.

26.     During the time period immediately proceeding his placement into the Trustee program, it was made known to the Jail that Crissman had used heroin shortly before his incarceration, and that he was suffering the effects of Heroin withdrawal. Such information was relayed by Crissman directly to Jail personnel, and at other times, these facts were obvious, as Crissman was exhibiting obvious symptoms of drug withdrawal (aka "dope sickness") as described by fellow inmates. These signs included but were not limited to; Crissman having uncontrolled and accidental bowl movements in his cell; vomiting several times in his cell; and otherwise appearing to be lethargic and not well.

27.     Despite such obvious signs of withdrawal, and all that was known by the Jail about Crissman's criminal history and background, Crissman was not provided any type of meaningful addiction treatment. Instead, the Jail conferred special status upon him that allowed him unsupervised access to areas outside of the Jails confines, as described above.

### Crissman Escapes

28.     On July 30, 2015, and as part of his tray duty responsibilities, Crissman and two other Trustee inmates were permitted to walk down a hall, through seven sets of doors which were remotely opened from a central location, to the outside of the Jail, with no direct supervision.

29.     The only monitoring in existence was at "Central Control," which consisted of merely one officer observing 120 camera monitors during the shift in question.  The officer, would remotely open the doors to allow the inmates to pass through.

5

30.     While waiting for the van to arrive, Crissman and the other two inmates were outside of the Jail's walls with no direct supervision.

31.     As the food van arrived, Crissman ran towards the gun range and eventually into woods that bordered the prison, easily escaping the Jail.

32.     One of the other Trustees notified a correctional officer that Crissman had fled. Subsequently, the correctional officer radioed to Central Control, who then called the lieutenant, who then tried to call the Warden three separate times, all to no avail.

33.     By the time the lieutenant of the Jail contacted 911, nearly fifteen minutes had passed since Crissman's escape. There was no warning siren to alert the nearby residents that a potentially dangerous inmate had escaped.

34.     While the Kittanning Police were being contacted by the Jail, Crissman ran to the residence of an acquaintance, Terry Slagle. Mr. Slagle lived with Tammy Long. She was inside when Crissman arrived.

35.     Mr. Slagle and Ms. Long were unaware that Crissman had escaped from the Jail at this time, as no siren or other warning had yet been communicated to the residents living near the Jail.

36.     At approximately 7:20 a.m., Mr. Slagle left the residence to go to work. Thereafter, Tammy Long agreed to give Crissman a ride into Kittanning.

37.     A short period of time thereafter, Tammy was beaten and strangled to death by Crissman, in her home.

38.     At around 2:30 p.m., the Kittanning police received a call from Mr. Slagle who informed them that he had come home to find Tammy. Crissman was no longer there.

39.     Eventually, on July 31, 2015 around 7:30 a.m., the Kittanning police were able to track, find, and capture Crissman after a high speed car chase. He has been charged with the

6

murder of Tammy Long and is awaiting trial.

## The District Attorney's Report

40.     In response to the events set forth above, the Armstrong County District Attorney's office initiated an investigation into the Jail's procedures and policies, as they related to Crissman's escape and Tammy Long's death.

41.     On September 29, 2015, the Armstrong County District Attorney's office released a report revealing the findings of their investigation (the "D.A. Report"). Said report was prepared by the Assistant District Attorney, Kathleen M. Charlton.

42.     The D.A. Report details the affirmative misuse of authority by the Defendants, all of which created an opportunity that otherwise would not have existed for Crissman's crimes to have occurred. These misuses relate to the deficient procedures, policies and customs utilized at the Jail, including, but not limited to:

      a. Approving Crissman for Trustee status less than a week into his confinement, despite an obvious drug problem;

      b. Approving Crissman for the Trustee program, despite actual knowledge and evidence that he was going through drug withdrawal;

      c. Approving Crissman for the Trustee program without first conducting a drug test;

      d. Placing inmates on lockdown without first having them commit to a 72-hour probation;

      e. Having in place a process for approving prisoners for Trustee status that did not consider factors such as an extensive criminal history and a history of non-compliance related to substance abuse issues;

      f. Having deficient policies relating to tray duty;

      g. Giving inmates on tray duty the authority and permission to prop open an outside door;

      h. Giving prisoners from the work release unit the authority to volunteer

7

and be accepted for tray duty;

i.   Authorizing or permitting inmates to be outside without supervision or monitoring;

j.   Providing inmates in the Trustee program with civilian clothing that consisted of dark green uniforms, tennis shoes and t-shirts, such that residents within the community such as Tammy Long would be unable to recognize an inmate, such as Crissman, as an escapee;

k.   Utilizing a "walkaway" escape policy that failed to notify the public and emergency services of a prison escapee within a short period of time;

l.   Having in place a policy of lax training, or in many instances, no training regarding the supervision of inmates at the Jail;

m.   Having in place a policy of lax security and supervision to such a degree that it allowed Crissman a clear opportunity to simply "run-off" and easily escape the confinement of the Jail; and,

n.   Operating a Jail that was understaffed.

43.   The D.A. Report also indicated that the Jail lacked a fence and that there was no warning system to notify the public of escaped inmates, despite the fact that the Jail itself is located in a residential area.

44.   Furthermore, the D.A. Report noted that 911 was not even notified of the Jail escape until over ten minutes after the escape occurred.

45.   The D.A. Report noted, not surprisingly, that based on the aforementioned policies, the Armstrong County Jail was a place inmates "want[ed] to go."

### CSI Report

46.   In reaction to the incident described above, Armstrong County hired a consulting firm, CSI Corporate Security and Investigations, to investigate whether or not the incident was preventable and to also review the policies and procedures of the Jail.

47.   The report containing the results of the investigation was finished and dated September 11, 2015 (hereinafter referred to as the "CSI Report"). Much like the D.A. Report,

8

the consulting firm found numerous issues concerning how prisoners were handled and how officers conducted themselves.

48.     The misuse of the Jail's authority detailed in the CSI Report include, but was not limited to, the following:

a.  Assigning Crissman to the work release unit without having adequate intelligence information on him;

b.  Training records were virtually non-existent, and to the extent they existed, there was a noticeable lack of clarity, organization and consistency;

c.  Having an escape plan that lacked a "pursuit team" to track down escaped prisoners;

d.  Having an escape plan that did not have escape packets to give to local and state police in the event of an inmate escape;

e.  Having emergency procedures in place that were vague and complicated;

f.  Having emergency procedures in place in the event that did not require calling 911 immediately;

g.  Having in place a policy of training for Jail employees which did not take into account the recognition of signs or symptoms of intoxication;

h.  Having a Warden who was supposed to approve inmates for the work release, but who instead delegated this decision;

i.  Allowing inmates to work outside of the Jail walls without officer supervision; and,

j.  Having in place policies that would allow the corrections officer in control of watching the Jail's video monitors to "nod off" during the critical time of Crissman's escape.

49.     The CSI Report also recognized a general complacency and lack of discipline that existed among Jail employees, supervisors, and inmates. The fact that the corrections officer in control of watching the video monitors "nodded off" during the critical time that Crissman escaped is emblematic of such complacency.

9

COUNT I – 42 U.S.C. § 1983
**Tara L. Long and Todd J. Long, Administrators of the Estate of Tammy E. Long
-vs- Armstrong County d/b/a Armstrong County Jail
(Wrongful Death)**

50.     Plaintiffs incorporate by reference all proceeding paragraphs as though the same were more fully set forth at length herein.

51.     At all times relevant hereto, the Jail, acting under the color of law, had a special relationship with the members of the surrounding community in that such persons, including the Plaintiffs' decedent, were clearly within the zone of danger should an inmate escape from the Jail. Such a relationship imposed an affirmative duty of care for the protection of this Plaintiffs' decedent, and the obligation to make sure prisoners like Crissman did not cause harm or injury to those in the community while under the Jail's custody and control.

52.     By taking Crissman into their custody, the Jail affirmatively took responsibility for the actions of Crissman by accepting the responsibility to restrict his freedoms and effectively removing him from society.

53.     At the time of Crissman's imprisonment, Defendant knew or should have known that Crissman was going through severe drug withdrawal, and as such it was foreseeable that he would take desperate measures to acquire drugs, including attempting to escape his confinement at the Jail and subsequently break and enter into nearby homes, doing harm to the residents therein.

54.     Crissman's escape was a direct result of the Defendants' active and affirmative misuse of authority, as evidenced by the defective policies and conduct identified above which is incorporated herein. The Jail's deliberate and conscious decisions concerning said policies demonstrate deliberate intent and/or willful deliberate indifference to the residents of the

10

community in which the Jail operated, to such a degree that it would shock the conscience of reasonably prudent citizens.

55.     The Jail's actions reflect a deliberate indifference and willful disregard for the safety of residents living close to the Jail, including Plaintiffs' decedent.

56.     It was foreseeable that the Jail's actions in allowing prisoners to roam free outside, without supervision, would place residents like Tammy Long at a great risk of harm.

57.     The Jail's affirmative and deliberate actions rendered the Plaintiffs' decedent more vulnerable to dangers than had the Defendant not acted in the manners described above.

58.     Furthermore, the conferring of Trustee status upon Crissman resulted in Crissman's actions being imputed to the Jail. By giving such special status to Crissman, the Jail was affirmatively asserting that it entrusted Crissman to safely and responsibly carry out his duties as a Trustee and representative of the Jail itself.

59.     Plaintiffs' decedent suffered injuries and damages, as indicated above and as more fully stated below, as a result of the defective policies, procedures, practices, directives and/or administrative procedures (hereinafter referred to as "policies"), as well as the reckless and/or deliberate indifference to the safety, health and constitutional rights of Plaintiffs' decedent in the following particulars:

   a.   Approving Crissman for Trustee status less than a week into his confinement, despite an obvious drug problem;

   b.   Approving Crissman for the Trustee program despite actual knowledge and evidence that he was going through drug withdrawal;

   c.   Approving Crissman for the Trustee program without first conducting a drug test;

   d.   Placing Crissman in the Work Release housing unit when, according to his classification, he should have remained in the Male Minimum Security unit;

11

e.  Permitting inmates such as Crissman to be considered for the Trustee status without first having them commit to a meaningful period of supervised probation;

f.  Having inadequate staffing levels;

g.  Having in place a process for approving prisoners for Trustee status that did not consider factors such as an extensive criminal history and a history of non-compliance related to substance abuse;

h.  Giving inmates on tray duty the authority and permission to prop open an outside door;

i.  Giving volunteers from the work release unit the authority to volunteer and be accepted for tray duty;

j.  Authorizing or permitting inmates to be outside without supervision or monitoring;

k.  Providing inmates in the Trustee program with civilian clothing that consisted of dark green uniforms, tennis shoes and t-shirts, such that residents within the community in which the Jail was a part of would be unable to recognize an inmate, such as Crissman, as an escapee;

l.  Utilizing a "walkaway" escape policy that failed to notify the public and emergency services of a Jail escapee within a short period of time;

m.  Having in place a policy of lax training, or in many instances, no training regarding the supervision of inmates at the Jail;

n.  Having in place a policy of lax security and supervision to such a degree that it allowed Crissman a clear opportunity to simply "run-off" and easily escape the confinement of the Jail;

o.  A policy of choosing cost-savings over security;

p.  Improperly monitoring or supervising inmates at the Armstrong County Jail who had known violent propensities;

q.  Having in place a policy of providing inadequate security personnel at the Armstrong County Jail during the 12-8 shift;

r.  Having emergency procedures in place that did not contain a warning system to alert nearby residents, such as Tammy Long, of the escape of a potentially violent inmate;

s.  Failing to utilize a fence around the Jail's perimeter, despite it being

located near a residential area;

t.   Having in place an escape protocol that did not immediately notify 911 and other emergency services of Robert Crissman's escape;

u.   By having in place other policies delineated by the D.A. Report and CSI Report; and,

v.   Having in place open deficient polices as may be further determined in discovery.

60.   The above actions of the Defendant directly and proximately caused the death of Tammy Long.

61.   By reason of the aforesaid, Tammy Long's civil rights were violated, including but not limited to those guaranteed under the Fourteenth Amendment to the Constitution of the United States and Constitution of the Commonwealth of Pennsylvania.

62.   Plaintiffs claim on behalf of the Estate any and all damages to which recovery may be made under § 8301 et al., which include but are not limited to the following:

a.   The cost of funeral and burial expenses occasioned by the death of Tammy Long;

b.   Loss of the value of services, assistance, comfort, guidance, counseling, companionship, and society of Tammy Long, past and future;

c.   Loss of financial support and all pecuniary benefits which would have been contributed by decedent to support her family to the end of her life expectancy;

d.   The expenses of the administration of the Estate of Tammy Long;

e.   Other financial losses suffered as a result of Decedent's injuries and death; and,

f.   Such other losses and damages as are recoverable by law or statute.

WHEREFORE, the Plaintiffs demand judgment in their favor against this Defendant for an amount in excess of the applicable Federal Jurisdictional limits, exclusive of interest and costs.

13

## COUNT II – 42 U.S.C. § 1983
### Tara L. Long and Todd J. Long, Administrators of the Estate of Tammy E. Long
### -vs- Armstrong County d/b/a Armstrong County Jail
### (Survival Action)

63.    Plaintiffs incorporate by reference all proceeding paragraphs as though the same were more fully set forth at length herein.

64.    As a direct and proximate result of the previously described conduct of the Defendant, which is incorporated by reference herein, Plaintiffs seek damages pursuant to the provisions of 42 Pa. C.S.A. § 8302, which include, *inter alia*:

    a.    Decedent's pain, suffering, mental anguish, inconvenience and other such damages that are permitted by law;

    b.    Decedent's loss of earnings and/or earning potential during the balance of her life expectancy calculated from the date of her death;

    c.    Such other losses and damages as are recoverable by law or statute; and,

    d.    Punitive damages.

WHEREFORE, the Plaintiffs demand judgment in their favor against this Defendant for an amount in excess of the applicable Federal Jurisdictional limits, exclusive of interest and costs.


## COUNT III – 42 U.S.C. § 1983
### Tara L. Long and Todd J. Long, Administrators of the Estate of Tammy E. Long
### -vs-  David Hogue
### (Wrongful Death)

65.    Plaintiffs incorporate by reference all proceeding paragraphs as though the same were more fully set forth at length herein.

66.    At all times relevant hereto, Defendant David Hogue was an agent of the County and/or the Commonwealth, acting in the course and scope of his employment and engaged in the performance of his duties as the Warden for the Armstrong County Jail.

67.    At all times relevant hereto, Defendant Hogue was acting under the color of law

14

pursuant to his authority as an officer of the Defendant, Armstrong County Jail.

68.    As Warden, Defendant Hogue was the commanding officer of all other officers working at the Jail, was responsible for the implementation and promulgation of the policies and customs of the Jail, and was further responsible for the training, conduct and supervision of the officers and employees of the Jail.

69.    As Warden, Defendant Hogue was a policy maker for the Armstrong County Jail, and it was therefore his duty to see that there were in place policies noted above, procedures, practices, customs, directives and/or other administrative procedures which assured that prisoners who were taken into custody at the Jail did not escape, and to further provide for the safety of the residents of the surrounding community. It was also his duty to see that such laws, ordinances, policies, procedures, customs, directives and/or other administrative procedures were actually followed by all Jail personnel or contractors.

70.    At all times relevant hereto, Defendant Hogue had actual and/or constructive knowledge of the policies and customs set forth above, and that said policies and/or customs would act to deprive and/or violated the constitutional rights of those such as Tammy Long.

71.    It was the duty of Warden Hogue to assume responsibility for the safety of the Jail's surrounding community and to assure that inmates did not escape from their confinement.

72.    In addition to the deficient policies noted above, the Plaintiffs' decedent suffered the injuries and damages described above as a result of the Defendant's conduct in instituting and implementing the following policies:

       a.    Instituting a policy which inadequately trained, supervised, monitored or disciplined officers where the need for more or different training, supervision, monitoring or discipline was obvious;

       b.    In failing to correct (through training, discipline, monitoring, policy

15

changes, etc.) Jail employees' conduct;

c.   In failing to investigate whether the Jail's officers and/or employees were complying with the policies and and/or customs, and whether such policies or customs in place provided the necessary security to prevent inmates from escaping;

d.   Delegating the assigned responsibility of approving inmates for the Trustee program to another employee;

e.   Instituting the policies which led to the assignment of Crissman to the Trustee program.

f.   In failing to respond to the lieutenant's telephone calls when Crissman was escaping; and,

g.   Instituting the aforementioned policies and procedures noted in all of the proceeding paragraphs above which are incorporated by reference, all of which led to a *laissez-faire* atmosphere of security at the Jail.

73.   The above actions of the Defendant were the direct and proximate cause of Ms. Long's injuries and death.

74.   By reason of the aforesaid, Plaintiffs' decedent's civil rights were violated, as stated above.

75.   As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiffs sustained the aforementioned injuries and have a right to the damages afforded to them by the Pennsylvania Wrongful Death Statute, which are more fully described in Count I above and incorporated herein.

WHEREFORE, the Plaintiffs demand judgment in their favor against this Defendant for an amount in excess of the applicable Federal Jurisdictional limits, exclusive of interest and costs.

## COUNT IV – 42 U.S.C. § 1983
### Tara L. Long and Todd J. Long, Administrators of the Estate of Tammy E. Long
### -vs- David Hogue
### (Survival Action)

76.   Plaintiffs incorporate by reference all proceeding paragraphs as though the same were more fully set forth at length herein.

77.   As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiffs sustained the aforementioned injuries and have a right to the damages afforded to them by the Pennsylvania Survival Act statute, which is more fully described in Count II above and incorporated herein.

WHEREFORE, the Plaintiffs demand judgment in their favor against this Defendant for an amount in excess of the applicable Federal Jurisdictional limits, exclusive of interest and costs.

Respectfully submitted,

KONTOS MENGINE LAW GROUP


  s/George M. Kontos
George M. Kontos, Esquire
PA I.D. No. 62712
Katie A. Killion
PA I.D. No. 205203
KONTOS MENGINE LAW GROUP
603 Stanwix Street
Two Gateway Center, Suite 1228
Pittsburgh, PA  15222
(412) 709-6162
(412) 904-3820/facsimile
gkontos@kontosmengine.com
kkillion@kontosmengine.com