IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TARA L. LONG and TODD J. LONG, | ) | |
| Administrators of the Estate of TAMMY | ) | |
| E. LONG, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-cv-01447 |
| vs. | ) | |
| | ) | |
| ARMSTRONG COUNTY, d/b/a | ) | |
| ARMSTRONG COUNTY JAIL, and | ) | |
| DAVID HOGUE, | ) | |
| | ) | **ORAL ARGUMENT REQUESTED/** |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

AND NOW COME Plaintiffs, Tara L. Long and Todd J. Long, as Administrators of the

Estate of Tammy E. Long, deceased, by and through their counsel, George M. Kontos, Esquire,

Katie A. Killion, Esquire, Claire McGee, Esquire, and Kontos Mengine Law Group, and file the

following Brief in Support of their Response to Defendant's Motion to Dismiss for failure to

state a claim, as follows:

## I.    INTRODUCTION

The concept of holding state actors responsible for grievous criminal acts, even when

undertaken by private individuals, is grounded and embodied in the bedrock of §1983 itself,

which reads in pertinent part:

> "Every person who under color of any statute…custom or usage of
> any state…subjects, or ***causes to be subjected***, any citizen of the
> United States...to the deprivation of any rights, privilege, or
> immunities secured by the Constitution and Laws, shall be liable to

1

the party injured in an action at law"… *42 U.S.C. Section 1983* (West 2000). (emphasis added)

Thus, the suggestion that is made throughout the Defendant's Brief, that the nature of the crimes committed by Crissman somehow weigh against a finding of § 1983 liability is supported neither by constitutional jurisprudence, nor the specific language and intent of the law upon which Plaintiffs seek relief. [1] The clear language of 42 U.S.C. § 1983 envisions state responsibility for privately inflicted harms.

## II.   STATEMENT OF THE FACTS

This action arises out of the killing of Plaintiffs' decedent, Tammy Long, by Robert Crissman, Jr. ("Crissman") on July 30, 2015, who had escaped approximately an hour earlier from the Armstrong County Jail ("Jail").

Crissman had an extensive criminal history which included crimes which can reasonably be said to involve violent behavior.[2] Compl. ¶ 14.  Crissman took part in the Jail's Trustee program, which was a type of inmate work release program that provided benefits to the "Trustees" consisting of special housing units as well as being allowed outside of the Jail's confinements, often times without supervision. Compl. ¶¶ 18, 19, 21, 22.  Crissman was assigned the job of "tray duty," which, in part, allowed him to be outside of the Jail's walls without being

---

[1] §1983 was passed by congress in 1871 and was specifically aimed at the Ku Klux Klan, a group of private actors. The history of §1983 was discussed by the Supreme Court in *Monell v Department of Social Services*, 436 U.S. 658 (1978). It was originally promoted to impose liability on governmental entities, officials and state actors if their actions "subject[ed]" any citizen to the deprivation of rights, privileges…etc.

[2] Defendants' Brief, on page 4, avers that Crissman had "never been arrested for a violent crime and had no prior history of violence."¶ 10.  Viewing the Complaint, especially when done so with all inferences in favor of the Plaintiffs indicates otherwise. In this respect, Plaintiffs' state that Crissman had a "record of significant criminal behavior [including] multiple instances of theft, criminal trespassing, breaking and entering, etc. . . . had a long history of drug abuse, [and was at the time of his incarceration] suffering the effects of heroin withdrawal, [which was] relayed by Crissman directly to Jail personnel." Such averments belie Defendants' contention that Crissman had an insignificant criminal history, devoid of any propensity toward violent behavior.

accompanied by a corrections officer.  Compl. ¶ 22.

Despite the fact that Crissman was known to the Jail as a user of hard drugs, and the fact that he even told Jail personnel he had used heroin shortly before his incarceration, he was never drug tested by the Jail at any time during his incarceration. Compl. ¶¶ 17, 24.

Moreover, Crissman was showing signs of heroin withdrawal, and had actually relayed directly to Jail personnel that he was "suffering the effects of heroin withdrawal." The Defendants, quite incredibly however, took the affirmative act of conferring Trustee status upon Crissman on July 29, 2015. Compl. ¶¶ 24, 26.  The very next day, while he was conducting his tray duty assignments outside of the jail's walls, and without any supervision, Crissman ran into the woods and successfully escaped from the Armstrong County Jail. The Jail had no surrounding fence. Compl. ¶¶ 28-31.   No one from the Jail contacted the town's emergency services or 9-1-1 until nearly fifteen minutes had passed. Compl. ¶ 33. No warning sirens were ever used which would have alerted residents to the escape. Compl. ¶ 33. During that time, Crissman traveled to the Long residence.  At the time, Tammy Long resided with Terry Slagle, who was an acquaintance of Crissman's. Compl. ¶ 34.  Neither Tammy Long nor Mr. Slagle knew that Crissman had escaped from Jail. Compl. ¶ 35.

Significantly, the Jail provided inmates in the Trustee program civilian clothing that consisted of dark green uniforms, tennis shoes and tee shirts, "***such that residents within the community such as Tammy Long would be unable to recognize an inmate such as Crissman, as an escapee***". Compl. ¶ 42(j) (emphasis added).

Thus, in addition to the affirmative action of granting Crissman Trustee status, the Jail also provided "street clothes" (as opposed to a clearly labeled 'prison uniform') to Crissman. This in effect, acted as camouflage for Crissman, allowing him to disguise the fact that he had

3

just escaped from jail. The Jail's action in this respect turned out to be of great consequence in aiding Crissman in his assault. Had Crissman shown up at Tammy Long's house (within view of the Jail) wearing a clearly labeled prison uniform, she would have immediately known not to trust him, and not to let him into her house. He would not have been able to gain her trust, come into her home, stay there for some period of time, and carry out his assault.

After Mr. Slagle left for work and Crissman was left alone with Ms. Long, he beat and strangled Ms. Long to death. Compl. ¶ 37.  He subsequently took her car and was recaptured by Kittanning police after a high speed car chase on July 31, 2015.

In the aftermath of Tammy Long's death and Crissman's subsequent recapture, the Armstrong County District Attorney's office undertook an investigation of the Jail's procedures and policies to examine how and why Crissman was able to easily escape. Compl. ¶ 40.  The findings from the investigation were memorialized in a report (the "D.A. Report").  The D.A. Report detailed affirmative misuses of authority and various policies, customs, and training failures.  These deficiencies are more fully stated in Plaintiffs' Complaint. Compl. ¶¶ 42-45.  At the same time, Armstrong County also hired an outside consulting firm, CSI Corporate Security and Investigations, to conduct a similar review.  Its report (the "CSI Report") revealed findings similar to that of the D.A. Report, the contents of which are more fully explained in Plaintiffs' Complaint. Compl. ¶¶ 48, 49.

Plaintiffs have subsequently filed wrongful death and survival actions as representatives of Tammy Long against the County and Warden David Hogue pursuant to 42 U.S.C. § 1983. Plaintiffs' claim that Defendants are liable for violating Tammy Long's 14th Amendment rights is based on two distinct theories: First, that the Third Circuit's "state created danger" test is satisfied in this matter. Secondly, that Crissman's status as a Trustee satisfies the well-settled

"Public Function test" in determining who is a "state actor" for § 1983 purposes.

## III.   STANDARD OF REVIEW

The standard for dismissal for a failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is well-settled.  The defendant has the burden of showing that no claim has been presented. *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir. 2005). All material allegations must be accepted as true and construed in a light most favorable to the non-moving party. *Rocks v. City of Philadelphia*, 686 F.2d 645 (3d Cir. 1989). The granting of a dismissal by result of a 12(b)(6) motion is highly disfavored. *Kurorolya v. United States*, 37 F.Supp. 2d. 717, 722 (E.D. Pa. 1999). Unless amendment would be futile, dismissal with prejudice should not be granted but rather leave to amend should be granted. See *Chemtech Intern, Inc. v. Chemical Injection Technologies, Inc.,* 170 Fed. Appx. 805 (3d Cir. 2006).

To survive a motion to dismiss, the plaintiff need only "allege facts sufficient to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). The complaint must include enough facts to state a claim to relief that is plausible on its face. *Id.* at 1974. This allows for either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory. *Id.* at 1969. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## IV.    LEGAL ARGUMENT

### A.  DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE STATED A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER 42 U.S.C. § 1983.

   1.  The Defendants' reliance on *Commonwealth Bank & Trust Co., N.A. v. Russell* is misplaced as that case was analyzed and decided prior to the Third Circuit's adoption of the "state created danger" theory.

   a.  ***Russell* is inapplicable to the case at bar as it was not decided using the Third Circuit's modern standard for a foreseeable, discrete class of plaintiffs as set forth in the third prong of the "state created danger" theory.**

   The Defendants' reliance of *Commonwealth Bank & Trust Co., N.A. v. Russell,* 825 F.2d 12 (3d Cir. 1987), and their analysis regarding its application to the case at bar is misplaced in light of recent case law. *Russell* was decided prior to both the adoption of the four prong analysis under the "state created danger" theory, and the expansion of the third prong as discussed in *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902 (3d Cir. 1997) and *Bright v. Westmoreland County,* 443 F.3d 276 (3d Cir. 2006). *Russell* was decided approximately nine (9) years prior to the Third Circuit's adoption of the "state created danger" theory in *Kneipp by Cusack v. Tedder*, 95 F.3d 1199,1201 (3d Cir. 1996).[3] Consequently, the developments leading to the modern "state created danger" theory, as discussed below, demonstrate the fallibility of the anachronistic approach suggested by the Defendants. Simply put, the *Russell* court did not rely upon nor analyze its facts under the *Kneipp* "state created danger" theory.[4]

---

[3]The "state created danger theory" was adopted in *Kneipp by Cusack v. Tedder*, 95 F.3d 1199,1201 (3d Cir. 1996); See also, *Morse v. Lower Merion Sch. Dist.,*132 F.3d 902,907 (3d Cir. 1997).See *Morse; see also, Bright v. Westmoreland County,* 443 F. 3d 276 (3d Cir. 2006)

[4] It is also worth noting that even though the Defendants' Brief relies so heavily on *Russell*, the court in that case, nevertheless, took great effort to illustrate a factual scenario very similar to the plaintiffs' case here, where it noted §

#### i.   *Russell* **predates the four prong analysis set forth in** *Kneipp.*

The Third Circuit in *Kneipp* clearly stated that the "state created danger" theory is a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983." *Kneipp* at 1201.  The *Kneipp* opinion sets out the "state created danger" theory by underlining a four prong analysis, which requires the plaintiff to plead the following:

(1)   The harm ultimately caused was foreseeable and fairly direct;

(2)   The state actor acted in willful disregard for the safety of the plaintiff;

(3)   There existed some relationship between the state and the plaintiff; and

(4)   The state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Id. at 1208.*

#### ii.   *Morse* **and** *Bright* **expanded the third prong of the "state created danger" theory to include as foreseeable plaintiffs "members of a discrete class of persons subjected to the potential harm brought about by the state's actions."**

By relying on R*ussell* in their analysis, the Defendants conflate the appropriate analysis to be used to evaluate Plaintiffs' claims, particularly as it relates to the analysis of the third prong of the "state created danger" theory.  This is perhaps most evident when one considers this matter in light of what the Third Circuit has stated in both *Morse* and *Bright*.

*Morse* acknowledged that the Third Circuit's analysis in *Russell* set forth a limited

---

1983 liability **would** apply. *Russell* at 16-17, cited *Nishiyama v. Dickson County*, 814 F.2d 277,281(6th Cir. 1987) in which an inmate who, like Crissman, had been given 'Trusty' status, used a patrol car (an 'instrumentality' provided by the state) to aid in his perpetration of his crime (pulling over a random motorist and raping her). As in the case found here, the 'Trusty' status, coupled with the state provided 'instrumentality' (i.e., the regular 'street' clothing given to Crissman by the jail) helped him to disguise the fact that he was an escapee, allowing him to gain Tammy Long's trust and enter her home; just as the 'Trusty' in Nishiyama used the state provided patrol car to hide his true identity to gain the trust of a passing motorist.

standard on who qualifies as a foreseeable plaintiff (i.e. a specific, identifiable victim). The *Morse* court suggests and the *Bright* court later adopts and implements a broader standard for determining what constitutes a foreseeable plaintiff.[5]

The *Morse* court discusses the change in the foreseeable plaintiff standard that the court applied in *Russell* as compared to the standard it applied.  In *Russell,* the plaintiffs were required to allege that "they faced a particular threat of harm which set them apart from the general public." *Morse* at 912.  However, ten years after *Russell* was decided, *Morse* repudiates this narrow standard, stating:

> "It seems evident that the Supreme Court's "public at large" language in *Martinez*, as well as our statements in *Commonwealth* [*Russell*] . . ., exclude from the reach of the state created danger theory those instances where the state creates only a threat to the general population. But it does not appear this limitation necessarily restricts the scope of § 1983 to those instances where a specific individual is placed in danger.  Another view of these cases would allow a plaintiff . . . ***to bring a state created danger claim if the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions.  Stated differently, depending on the facts of a particular case, a "discrete plaintiff" may mean a specific person <u>or a specific class of persons</u>.***"

*Morse* at 913. (Internal quotation marks in original)(Emphasis added).

*Bright,* which the Defendants' cite in their brief, likewise broadened the third prong of the "state created danger" which now reads as follows:

> ". . . (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," ***or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions,"*** *as opposed*

---

[5] The court in *Bright v. Westmoreland County,* 443 F.3d 276, 282, 281 (3d Cir. 2006), states the third prong of the "state created danger" theory as being "a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a ***discrete class of persons*** subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general. . ." (emphasis added)

to a member of the public in general. . ." *Id.* (emphasis added)

Thus, since *Russell*, the Third Circuit has recognized other situations involving plaintiffs who are part of an identifiable and discrete class of individuals who fit within the ambit of those persons having actionable claims under the "state created danger" theory. *Morse at* 914. The "state created danger" theory therefore, does not *per se* require knowledge that a specific individual has been placed in harm's way. The court further stated that, ". . . there would appear to be no principled distinction between a discrete plaintiff and a discrete class of plaintiffs. The ultimate test is one of foreseeability." *Id.*[6]

Here, the Defendants try to combine the court's holding in *Russell* with the broader foreseeable plaintiff's standard in *Bright* to argue that the residents, including Tammy Long who live in close proximity to the Armstrong County Jail are not a discrete class of plaintiffs. Again, *Russell* was not decided using the "discrete class of plaintiffs" standard and the modern four prong analysis of the "state created danger" theory.

For these reasons, the *Russell* court's holding is not, as the Defendants suggest, applicable to the case at bar.

Plaintiffs will now address each prong of the "state created danger" theory, and demonstrate that they have plead sufficient facts in their Complaint to withstand the Defendants' Motion to Dismiss.

> **2. Under the modern four prong analysis of the "state created danger" theory, the Plaintiffs have plead sufficient facts to withstand the Defendant's Motion to Dismiss.**

Taking into account the Plaintiffs argument above, it seems appropriate to begin the

---

[6] The *Morse* court does not decide whether the plaintiffs were a foreseeable, discrete class of plaintiffs in that case because the plaintiffs did not satisfy the other three prongs of the *Kneipp* test (i.e. the four prongs). *Morse* at 914.

"state created danger" theory analysis with the third prong and, in turn, discuss the remaining prongs.

> a. **Tammy Long and the residents in close proximity of the Armstrong County Jail are members of a discrete class of persons subjected to the potential harm brought about by the states' actions, as opposed to members of the public in general.**

Plaintiffs' Complaint states in pertinent part the following with respect to Tammy Long's status as a member of a discrete class of persons:

> ¶ 6    The Jail is located among a residential community. Tammy Long *resided within a quarter mile of the Jail, being able to see the Jail from the front porch of her home*.
>        . . .
> ¶ 23   At all times relevant hereto, inmates with trustee status were representatives of the Jail itself, as the Jail had direct control over their actions and interaction with the community at large. As such, Trustees, like Crissman, acted . . . with the understanding that they had been property vetted and screened *in such a manner as to not present a heightened risk . . . to those members of the community such as Tammy Long, who resided so close to the Jail.*
>        . . .
> ¶ 33   By the time the lieutenant of the Jail contacted 911, nearly fifteen minutes had passed since Crissman's escape. There was no warning siren *to alert the nearby residents that a potentially dangerous inmate had escaped*.
>        . . .
> ¶ 35   Mr. Slagle and Ms. Long were unaware that Crissman had escaped from the Jail at this time, as *no siren or other warning had yet been communicated to the residents living near the Jail.*
>        . . .
> ¶ 42(j) Providing inmates in the Trustee program with civilian clothing that consisted of dark green uniforms, tennis shoes and t-shirts, *such that residents within the community such as Tammy Long would be unable to recognize an inmate, such as Crissman, as an escapee*.
>        . . .
> ¶ 51   . . . such persons, including the Plaintiffs' decedent, were clearly within the zone of danger should an inmate escape

> from the Jail.  Such a relationship imposed an affirmative duty of care for the protection of this Plaintiffs' decedent, and ***the obligation to make sure prisoners like Crissman did not cause harm or injury to those in the community while under the Jail's custody and control***.
>
> . . .
>
> ¶ 53   At the time of Crissman's imprisonment, Defendant knew or should have known that Crissman was going through severe drug withdrawal, and as such ***it was foreseeable that he would take desperate measures to acquire drugs, including attempting to escape his confinement at the Jail and subsequently break and enter into nearby homes, doing harm to the residents therein.***
>
> . . .
>
> ¶ 56   It was foreseeable that the Jail's actions in allowing prisoners to roam free outside, without supervision, ***would place residents like Tammy Long at a great risk of harm***.

(emphasis added)

The above demonstrates that Plaintiffs' have sufficiently plead that Tammy Long was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions.

In support of its holding the court in *Morse* relied upon *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), where police officers arrested the driver of a vehicle and left behind an intoxicated passenger, with the keys to the vehicle. See *Morse* at 913. See also, *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993)

A few hours after the initial arrest, the passenger while driving the arrestee's vehicle, collided head on with the plaintiff's vehicle, killing the plaintiff's wife and pre-natal son, and injuring the plaintiff. *Id*. The only connection the plaintiffs had to the state actors and drunk driver was that they were members of a class of individuals who had randomly been traveling along the same highway.

The *Reed* court held that "the officers . . . initiated the state action, by arresting the [original driver] and removing her from the car. That state intervention created the dangerous

11

condition, a drunk driver on the road." *Reed* at 1126.

Moreover, the court in *Reed* found that the defendant's lack of direct contact with the plaintiffs does not necessarily preclude this action against them. *Id.* at 1126-1127. Instead, the court held that "by removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one." *Id.* at 1127. The court added, "***when the police create a specific danger, they need not know who in particular will be hurt. Some dangers are so evident, while their victims are so random, that state actors can be held accountable by any injured party***." *Id.* (emphasis added).

Similar to the foreseeable discrete class of plaintiffs in *Reed* (i.e. random motorists in the vicinity of the drunk driver), here residents, including Tammy Long, who live in the close vicinity to the Jail are a foreseeable, discrete class of plaintiffs for § 1983 purposes.

### b.  The harm ultimately caused to Tammy Long was foreseeable and fairly direct.

This prong requires plaintiffs to plausibly plead that the harm was both "foreseeable and fairly direct." *Morse* at 908. A plaintiff adequately pleads the element of foreseeable harm by alleging 'an awareness on the part of the state actor that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.[7] Furthermore, to show that the defendants' conduct was "fairly direct" the test provides that the defendants' actions cannot be separated from the ultimate harm by a lengthy period of time and intervening actions." [8]

---

[7] *Benedict, et. al, v. Southwestern Pennsylvania Human Resources, Inc., et. al*., No. 2:14-cv-0678, 21-22 (W.D. Pa. Mar. 24, 2015).
[8] *Id.*

Plaintiffs' Complaint in this respect states the following:

¶ 14    . . . Crissman was a known drug user who also had a record of significant criminal behavior which included multiple instances of theft, criminal trespassing, ***breaking and entering***, driving under the influence, and use/possession of drugs and drug paraphernalia.

. . .

¶ 15    Starting in 2003, Crissman was arrested numerous times for the above-stated criminal actions. He served several lengthy stints at the Armstrong County Jail and was often sentenced to probationary periods. On numerous occasions, Crissman violated the conditions of his parole. Many of his arrests were related to hard drug use, all of which was known to Defendants.

. . .

¶ 21    Trustees working outside of the Jail, even on the Jail premises, did not have a guard from the Jail accompanying them. Observation of the inmates' actions in these instances was merely done via security camera.

. . .

¶ 22    One of the jobs a Trustee could hold at the Jail was "tray duty." Trustees who were assigned tray duty were to proceed through the kitchen, and then outside, to wait for a van to deliver meals on trays. These Trustees were typically not escorted by a corrections officer. Once outside, Trustees would often prop an exterior door open with a large brick while they waited for a van to deliver meals.

. . .

¶ 24    Crissman ***was granted*** Trustee status on July 29, 2015 without going through any probationary period beforehand, nor having any meaningful screening performed by the Jail.

. . .

¶ 26    During the time period immediately proceeding his placement into the Trustee program, it was made known to the Jail that Crissman had used Heroin shortly before his incarceration, ***and that he was suffering the effects of heroin withdrawal. Such information was relayed by Crissman directly to Jail personnel***, and at other times, these facts were obvious, as Crissman was exhibiting obvious symptoms of drug withdrawal (aka "dope sickness") as described by fellow inmates. These signs included but were not limited to; Crissman having uncontrolled and accidental bowl movements in his cell; vomiting several times in his cell; and otherwise appearing to be lethargic and not well.

. . .

¶ 27    Despite such obvious signs of withdrawal, and all that was known by the Jail about Crissman's criminal history and background, Crissman was not provided any type of meaningful addiction treatment. ***Instead, the Jail conferred special status upon him that allowed him unsupervised access to areas outside of the Jails confines***, as described above.

. . .

13

¶ 42(b) Approving Crissman for the Trustee program, despite actual knowledge and evidence that he was going through drug withdrawal.

. . .

¶ 53   At the time of Crissman's imprisonment, Defendant knew or should have known that Crissman *was going through severe drug withdrawal, and as such it was foreseeable that he would take desperate measures to acquire drugs, including attempting to escape his confinement at the Jail and subsequently break and enter into nearby homes, doing harm to the residents therein*.

(emphasis added).

In *Kneipp*, the court held that the injuries to the decedent were foreseeable as result of the police allowing someone who was heavily intoxicated to walk home alone at night in the winter time. The court held that a reasonable trier of fact could conclude that in plaintiff's state of intoxication, she would be more likely to fall and injure herself if left unescorted than someone who was not inebriated. *Kneipp* at 1208.

Similar to the defendant's knowledge in *Kneipp* and *Reed*, the Defendants here had actual knowledge that Crissman was going through drug withdrawals. He actually made Jail personnel aware of this fact. This illustrates that the Defendants knew and should have been aware of the risks posed by placing Crissman in the Trustee program. The Trustee program was only for inmates who were incarcerated for DUIs and Child Support payment violations. Placing an inmate, such as Crissman, who had a significant criminal history into the Trustee program, at a time when they actually knew he was going through heroin withdrawal, coupled with the lax security and "outside privileges" afforded with that status, demonstrates the disregard of a foreseeable risk that Crissman would take desperate measures to acquire drugs, including attempting to escape and subsequently break and enter nearby homes. Compl. ¶ 53.

In *Reed*, it was the state's action of knowingly removing the sober driver and placing a drunk driver behind the wheel that turned a safe condition, into a dangerous, condition and thereby rendering persons within close proximity foreseeable and vulnerable to the threatened

harm posed by the defendant. Furthermore, the court held that "[d]espite the two hour time lapse and the distance between the place of the [original driver's] arrest and the car accident, the events are *not* sufficiently attenuated to relieve the defendants of section 1983 liability." *Id.* (emphasis added).[9]  Ultimately, the court held that the police officers' act "rendered the [plaintiffs] and other motorists on the Route 130 vulnerable to a dangerous driver."[10]

Likewise, the Defendants here knowingly and affirmatively created a dangerous condition for Tammy Long and the residents around the jail, and failed to take reasonable preventative steps to diffuse that danger. For these reasons, the Plaintiffs have plead sufficient facts as it relates to the foreseeable and fairly direct prong of the "state created danger" theory.

### c. The Defendants' acted with a degree of culpability that shocks the conscience.

In *Kneipp*, the court found that plaintiffs adduced sufficient evidence to raise a material issue as to whether the defendant acted in willful disregard for the decedent's safety. *Kneipp* at 1210. The plaintiff presented evidence regarding the decedent's level of intoxication and impairment by the defendant's admission that he knew she was intoxicated. *Id.*  Here, the Plaintiffs have sufficiently plead, and the facts upon which those averments are based, evidence that the requisite degree of culpability exists in this matter.  Plaintiffs' Complaint in this respect, states in pertinent part:

> ¶ 54    Crissman's escape was a direct result of the defendants' active and affirmative misuse of authority, as evidenced by the defective policies and conduct identified above which is incorporated herein. The Jail's deliberate and conscious decisions concerning said policies ***demonstrate deliberate intent and/or willful deliberate indifference to the residents of the community in which the Jail operated, to such a degree that it would***

---

[9] Significantly, compared to *Reed*, the time elapsed between the state action and the injury was even shorter in this case.
[10] *Morse* at 913. See also, *Reed*, *supra*.

*shock the conscience of reasonably prudent citizens.*

. . .

¶ 55   The Jail's actions reflect a deliberate indifference and willful disregard for the safety of residents living close to the Jail, including Plaintiffs' decedent.

. . .

¶ 59   . . . which states in pertinent part:

a.   Approving Crissman for Trustee status less than a week into his confinement, despite an obvious drug problem;

. . .

b.   Approving Crissman for the Trustee program despite actual knowledge and evidence that he was going through drug withdrawal;

. . .

c.   Approving Crissman for the Trustee program without first conducting a drug test;

. . .

g.   Having in place a process for approving prisoners for Trustee status that did not consider factors such as an extensive criminal history and a history of non-compliance related to substance abuse;

. . .

j.   Authorizing or permitting inmates to be outside without supervision or monitoring;

. . .

n.   Having in place a policy of lax security and supervision to such a degree that it allowed Crissman a clear opportunity to simply "run-off" and easily escape the confinement of the Jail;

. . .

p.   Improperly monitoring or supervising inmates at the Armstrong County Jail who had known violent propensities

Moreover, in *Reed*, the court held that the defendants engaged in actionable conduct by removing a sober driver and placing a drunk driver behind the wheel.[11] Here, the Defendants' initiated the culpable state action in a number of ways, most notably by conferring Trustee status, with all of its special privileges, and lack of supervision, to someone who, by his own history of

---

[11] Although the *Reed* court found the defendant's action not as shocking as the defendants' actions in *Nishiyama v. Dickson County*, 814 F.2d 277 (6th Cir. 1987) the court, nevertheless, found the defendants in *Reed* to have engaged in reckless conduct.

crimes and drug use, as well as his own statements to Defendants regarding his heroin withdrawal, was not fit for such a "trusted status." Such conduct as plead, evidences a conscious disregard of a serious risk on the part of the Defendants.

> **d.  The Defendants affirmatively used their authority in a way that created a danger to the citizens in close proximity to Armstrong County Jail, or that rendered the citizens more vulnerable to danger than had the state not acted at all**.

Defendants' Brief does not present any concrete allegations or even plausible inferences that the Plaintiffs have failed to plead sufficient facts in their Complaint as to the fourth prong of the "state created danger" theory. The Defendants have the burden of showing that no claim has been presented. *Hedges v. United States*, 202 F.3d 744, 750 (3d. Cir. 2005). This Honorable Court has previously held in *Benedict, et. al, v. Southwestern Pennsylvania Human Resources, Inc., et. al*., No. 2:14-cv-0678, 19 n.15 (W.D. Pa. Mar. 24, 2015), "[s]ince defendants do not contest that plaintiffs have alleged facts establishing the third prong of the test [state created danger theory], the Court assumes without deciding that plaintiffs' claim meets that element."

As a precautionary measure only, Plaintiffs will argue that they have plead in their Complaint sufficient facts that, with inferences viewed most favorably to the Plaintiffs, would establish that the Defendants affirmatively used their authority in a way that created a danger to Tammy Long, rendering her more vulnerable to danger than had the state not acted at all.

In *Reed*, the court found that the officers initiated the state action, by arresting the driver and removing her from the car. The state intervention created the dangerous condition, a drunk driver on the road. *Reed* at 1126. In other words, the police officers created a danger to those on the roadways and/or rendered the motorists more vulnerable to the danger than had the state not acted at all.

Additionally, there were various other actions undertaken by the Defendants here which rendered citizens like Tammy Long more vulnerable than had it not acted. As noted above, the Jail's affirmative act of providing inmates in the Trustee program with civilian clothing, instead of a clearly labeled prison uniform rendered Tammy Long more vulnerable and susceptible to harm in this case. Those actions facilitated Crissman's acts in a way that would not have been possible had the Jail not acted in this regard.

Of course, as it has been noted even more extensively above, the actions of affirmatively granting and conferring Trustee status upon Crissman, in light of everything that was known about him, coupled with the lack of security for such specially designated inmates, enabled him to escape so easily. His easy, essential "walk off," would have not have been possible without the Jail's act of conferring that special status to him, because he would not have had unsupervised access outside of the walls of the jail.

Additionally, it was also plead in this case that the Jail, by having the Trustee program and in being located in and among a residential neighborhood, made implied assurances to those in the surrounding community that it had properly vetted and screened the individuals who would be given the special privileges associated with Trustee status. This is so, especially in light of the fact that those individuals were all convicted of some crime, and were by law sentenced to be confined in a prison setting. It is certainly reasonable and plausible to expect, therefore, that residents who lived so close to the jail would proceed with the assurance that individuals in the program were conferred such status in a way that would not present a heightened risk to their community. In this respect, Plaintiffs Complaint states as follows:

¶ 23    inmates with Trustee status were representatives of the Jail itself, as the Jail had direct control over their actions and interactions with the community at large. As such, Trustees, like Crissman, acted with the special privileges and rights conferred upon them by the Jail, ***with the understanding that they had been***

> ***properly vetted and screened in such manner as to not present a heightened risk to the community at large***, and more specifically, to those members of the community such as Tammy Long, who resided so close to the Jail.
>
> . . .
>
> ¶ 58    Furthermore, the conferring of Trustee status upon Crissman resulted in Crissman's actions being imputed to the Jail.  By giving such special status to Crissman, ***the Jail was affirmatively asserting that it entrusted Crissman to safely and responsibly carry out his duties as a Trustee and representative of the Jail itself.***

In *Kneipp*, the police officers did ***not even vocalize*** to the husband that they would take care of his wife and ensure that she would make it home safe.  Instead, the court found a voluntary "assumption" of responsibility by the state actor in that case, noting:

> ". . . [b]y voluntarily assuming responsibility for her [decedent's] protection when they told her husband he could leave, it was alleged that the officers affirmatively created danger and increased the risk that the [decedent] might be injured when they later abandoned her. It was further alleged that the police conduct made the [decedent] more vulnerable . . . [by] . . . intervening with the efforts of her husband to assist his wife safely."

*Kneipp* at 1203.

For all of these reasons, Plaintiffs have properly plead and satisfied the fourth prong of the "state created danger" theory.

## B.  THE PLAINTIFFS' COMPLAINT ESTABLISHES A CLAIM FOR CRISSMAN'S ACTIONS AS A "STATE ACTOR"

In addition to the theories set forth and enumerated above, Plaintiffs' Complaint sets forth an additional theory of liability. To wit: that Robert Crissman was, based on his special status of "trusty", a "state actor." In this respect, the Plaintiff has plead that Crissman was given special rights and privileges conferred upon him directly by the Defendants, and as such, was acting with the imprimatur and authority of the state. In this regard the Complaint states the following:

> ¶23    At all times relevant hereto, inmates with trustee status were representatives of the jail itself, as the jail had direct control over their

             actions and interactions with the community at large. As such, trustee such as Crissman acted with the special privileges and rights conferred upon them by the jail . . .

…

¶27    ... the jail conferred special status upon [Crissman] that allowed him unsupervised access to areas outside of the jail's confines, as described above.

…

¶58    Furthermore, the conferring of trusty status upon Crisssman resulted in Crissman's actions being imputed to the jail. By giving such special status to Crissman, the jail was affirmatively asserting that it entrusted Crissman to safely and responsibly carry out his duties as a "**trusty *and representative of the jail itself* **".

…

¶51    At all times relevant hereto, the jail, act[ed] under the color of law . . .

The above language indicates that the Plaintiffs have pled that, based on the Defendants' conferral of trusty status upon Crissman he was, in effect, a representative of the jail, imbued with certain powers and privileges, and that the jail (and any such representative like Crissman) were acting "under color of law".

### 1.  **Plaintiff's claim satisfies the "Public Function" Test.**

    Whether a constitutional violation results from state action is a question that has been subject to multiple tests and analysis by both the US Supreme Court as well as the Third Circuit. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Community Medical Ctr. v. Emergency Medical Services*, 712 F.2d 878 (3d. Cir. 1983); *Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir. 1984); *Mark v. Borough of Hatboro*, 856 F.Supp 966 (1994); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982); *Jackson v. Metropolitan Edison Co*., 348 F.Supp 954 (1972); *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). No single analysis has been adopted to determine the presence of "state action" in a §1983 case. *Mark* at 970. Various approaches have been undertaken, including the "public function" test, "close nexus" test and the "symbiotic relationship" approach. *Id*. at 971.

20

There is no single analysis applicable to determine the presence of state action in a §1983 case. It is a factually intensive analysis to be decided by considering all of the surrounding circumstances. *Lugar* at 939; See also, *Brandon v. University of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973); *Kronmuller v. West End Fire Co.*, 123 F.R.D. 170, 173 (E.D. Pa. 1988).

Sometimes referred to generically as the "Public Function Test" a private actor that is performing a function that has been "traditionally the exclusive prerogative of the state" will be deemed a "state actor" for purposes of §1983 liability. *Mark* at 971. The inquiry is one that is to be done on a "case by case basis."

The touchstone of the "public function" test is one that involves a fact based, historical exploration of the function at issue. For example, in *Edmundson v. Leesville Concrete*, 500 U.S. 614, 617 (1991) the Supreme Court did find that a private actor (the defendant in a private lawsuit) could be deemed a "state actor" under §1983 by using a preemptory challenge in a civil jury proceeding in a discriminatory way. This is so, the court held, because the use of a preemptory challenge by a private party involved ***the performance of a traditional function of government***.[12]

As in those cases equating private action with state action under §1983, the housing and maintenance of inmates, and the running of a jail, has been the exclusive prerogative of the state. As such, the jails conduct in performing such functions, and in deciding to make Crissman a

---

[12] As opposed to *Mark v. Borough of Hatboro*, 856 F.Supp. 966 (E.D. Pa 1994), finding that a volunteer fire fighter who was not properly vetted, and who had committed arson was not a state actor for § 1983 purposes. The court there stated that, historically, and in the particular facts of the case at hand, fire protection services "were not the exclusive provence of the state". *Id*. at 970. It noted that in "Colonial America, all firefighting was done by private volunteers "[and that]" volunteer fire companies were formed under Benjamin Franklin's auspices after a serious fire in 1736". *Id*. at 973; See also, *Rendell-Baker et. al. v. Kohn et. al., 457 U.S. 830, 842 (1982)*(holding the that educational services to trouble youths, was not "traditionally and exclusively the prerogative of the state". Thus, private actors who were responsible for violations of the Plaintiff's civil rights in such a situation were not found to be state actors.); See also, *Blum v. Yaretsky et. al*., 457 U.S. 991,1012A (1982)(holding that the day to day administration of a Nursing Home was found not to encompass "the kind of decisions traditionally and exclusively made by the sovereign or on behalf of the public.)

functionary of the jail by bestowing trusty status upon him, made him a part of that system as it concerned the carrying out of the jails responsibilities. In this regard, Plaintiffs have pled that by **"conferring trusty status upon Crissman "[and]" giving such special status to [him], the jail was affirmatively asserting that it entrusted [him] to safely and responsibly carry out his duties as a 'trusty and representative of the jail itself."** Compl. ¶58.

Based on the above, the actions of Crissman, as noted in the Complaint, were those of the Defendants. As such, his actions in violating Tammy Long's constitutional rights are to be deemed those of a "state actor".

### C.  PLAINTIFFS' COMPLAINT, SPECIFICALLY PARAGRAPHS (40) THROUGH (49) SHOULD NOT BE STRICKEN AS INDICATED BY THIS HONORABLE COURT.

Plaintiffs incorporate herein what was noted in this Honorable Court's Order dated January 13, 2016, that all reasons and analysis is applicable and should be used to deny Defendants' portion of their Motion to Dismiss, to wit:

> "First, the Court concludes that the matters raised by the Motion to Strike are better resolved as part of the disposition of the pending Motion to Dismiss. Second, it appears to the Court that the Motion is premature, in that it seeks to have the Court resolve an evidentiary issue at a juncture at which the Court does not have a record that would enable it to do so. Third, on the merits, it facially appears to the Court that the Defendants' reliance on Fed. R. Evid. 407 is inapt, in that the challenged portions of the Complaint do not recite "subsequent remedial repairs", but relate to the conduct and results of official governmental investigations, rather than any "remedial" actions taking in reliance upon them. See Fed. R. Evid. 803(8)."

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request this Honorable Court to deny Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and find that Plaintiffs have sufficiently plead a claim upon which relief can granted under 42 U.S.C. § 1983.

Respectfully submitted,

By: /s/ George M. Kontos
George M. Kontos, Esquire
gkontos@kontosmengine.com

By: /s/ Katie A. Killion
Katie A. Killion, Esquire
kkillion@kontosmengine.com

By: /s/ Claire McGee
Claire McGee, Esquire
cmcgee@kontosmengine.com

KONTOS MENGINE LAW GROUP
603 Stanwix Street
Two Gateway Center, Suite 1228
Pittsburgh, PA 15219
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

We, George M. Kontos, Esquire and Katie A. Killion, Esquire, hereby certify that a true and correct copy of the foregoing Brief In Support Of Plaintiffs' Response to Defendants Motion to Dismiss was filed on January 22, 2016 with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to the following:

THE MACMAIN LAW GROUP, LLC
David J. MacMain
101 Lindenwood Drive, Suite 160
Malvern, PA 19355
*Attorney for the Defendants, Armstrong County d/b/a*
*Armstrong County Jail and David Hogue*

By: /s/ George M. Kontos
George M. Kontos, Esquire
gkontos@kontosmengine.com

By: /s/ Katie A. Killion
Katie A. Killion, Esquire
kkillion@kontosmengine.com

By: /s/ Claire McGee
Claire McGee, Esquire
cmcgee@kontosmengine.com

KONTOS MENGINE LAW GROUP
603 Stanwix Street
Two Gateway Center, Suite 1228
Pittsburgh, PA 15219
*Attorneys for Plaintiff*