# The MacMain Law Group LLC

101 Lindenwood Drive • Suite 160 • Malvern, PA 19355 • www.macmainlaw.com

David J. MacMain
Telephone: (484) 463-1016
Facsimile: (484) 328-3996
Email: nfreiler@macmainlaw.com

April 20, 2016

**Via ECF**
The Honorable Mark R. Hornak
United States District Judge
U.S. Courthouse
700 Grant Street
Pittsburgh, PA 15219

   **RE:** ***Long v. Armstrong County, et al.***
      **Civil Action No. 15-cv-01447**

Dear Judge Hornak,

  Please allow this correspondence to serve as a supplement to Defendants' Motion to Dismiss (Doc. 9.) Specifically, I write to advise the Court of a decision that was rendered by the United States Court of Appeals for the Eighth Circuit on April 7, 2016, after the completion of briefing and argument on Defendants Motion to Dismiss. Although a decision of the Eighth Circuit is not binding on this court, the Eighth Circuit's analysis may prove to be persuasive given the similarities between the two cases.

  In Kruger v. Nebraska, No. 15-1427, 2016 WL 1376343 (8th Cir. 2016), the Eighth Circuit held that neither the special relationship, nor the state created danger exception provided a viable theory of liability against individual corrections administrators after a violent inmate, who was released prior to the expiration of his sentence, murdered four individuals shortly after his release. In affirming the district court's decision granting the defendants' motion to dismiss, the Eighth Circuit explained that the district court was not "required to take as true the dubious legal conclusions that there are constitutional rights to 'freely associate and travel about the City of Omaha' which are 'clearly established' and of which 'any reasonable official' would have been aware." (Id.)

  Citing to the Eleventh Circuit's decision in Lovins v. Lee, the Eighth Circuit explained that "there is no general substantive due process right to be protected against the release of criminals from confinement, even if that release violates the law." Id., citing, Lovins v. Lee, 53 F.3d 1208, 1209 (11th Cir. 1995). The Eighth Circuit went on to explain that the state created danger exception did not apply because the victim was "not a member of a limited, precisely definable group. We agree with the district court's decision that membership in the general public does not suffice." Id.

The Honorable Mark R. Hornak
April 20, 2016
Page | 2

      While somewhat factually distinguishable from the present case, this is nevertheless one more affirmation of the proposition that no special relationship exists between the government and members of the community who reside near corrections institutions and who suffer harm at the hands of those confined to such institutions.

      I have enclosed a copy of the <u>Kruger</u> decision for your review. Thank you in advance for your consideration of our Motion.

                                    Respectfully submitted,

                                    David J. MacMain

Cc:    (*via EFC*)
        George M. Kontos
        Katie A. Killion

2

2016 WL 1376343
Only the Westlaw citation is currently available.
United States Court of Appeals,
Eighth Circuit.

Michael–Ryan KRUGER, Special Administrator of the Estate of Andrea Kruger, Plaintiff–Appellant
v.
State of NEBRASKA; Robert Houston, Retired Director, Department of Correctional Services, in his official and individual capacities; Cameron White, Behavioral Health Administrator, Department of Correctional Services, in his official and individual capacities; Dr. Randy Kohl, in his official and individual capacities; Department of Corrections, Defendants–Appellees.

No. 15–1427.
|
Submitted: Nov. 18, 2015.
|
Filed: April 7, 2016.

Appeal from United States District Court for the District of Nebraska—Lincoln.

**Attorneys and Law Firms**

James C. Zalewski, argued, Lincoln, NE, (Vincent M. Powers, Kathleen Marie Neary, Lincoln, NE, on the brief), for Plaintiff–Appellant.

David A. Lopez, AAG, argued, Lincoln, NE, (Ryan Post, AAG, Lincoln, NE, on the brief), for Defendants–Appellees.

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.

**Opinion**

RILEY, Chief Judge.

*1 Nikko Jenkins was released from prison in July 2013 after serving ten and one-half years of a twenty-one-year sentence. About three weeks after his release, he killed four people in Omaha, Nebraska, including Andrea Kruger. After Andrea's death, her husband, Michael–Ryan Kruger, as special administrator for Andrea's estate, sued in the District Court of Douglas County, Nebraska, the State of Nebraska; the Department of Corrections (department); three department officials; Correct Care Solutions (CCS), a private contractor the department retained to provide prison psychiatric services to inmates including Jenkins; and CCS employee Dr. Natalie Baker. The department officials named were Robert Houston, the former department director; Cameron White, Ph.D., the department's Behavioral Health Administrator; and Dr. Randy Kohl, the department's Deputy Director of Health Services (collectively, department officials). In his second amended complaint, Kruger named only the State of Nebraska and the department officials.

Kruger alleged deliberate indifference, violation of Andrea's substantive due process rights under the Fourteenth Amendment to the United States Constitution, see 42 U.S.C. §§ 1983, 1988(a), and state law negligence claims under the Nebraska State Tort Claims Act (STCA), Neb.Rev.Stat. § 81–8,209 et seq. After the case was removed to federal court, see 28 U.S.C. §§ 1441, 1446, the district court[1] granted the state and department officials' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(3), (6).[2] Kruger appeals. We affirm.[3]

**I. BACKGROUND**[4]

Kruger's complaint alleged "the State of Nebraska released Jenkins, a violent and dangerous criminal, from incarceration" before he had served his full term even though "Jenkins repeatedly exhibited signs of serious mental health issues." According to Kruger, Dr. Baker evaluated Jenkins numerous times between 2009 and 2013, and Jenkins repeatedly told Dr. Baker about his delusional and violent thoughts. Jenkins informed Dr. Baker "he had been hearing the voice of an Egyptian god who told him to harm others" and "he often had violent thoughts, and fe[lt] he w[ould] hurt others when released." Kruger also pled "Jenkins repeatedly told staff evaluators he did not want to be released into the community because he will kill people." Less than six months before Jenkins's release, Dr. Baker reported Jenkins "had a mental illness" and he "was an imminent danger to hurt somebody." She recommended a civil commitment. Jenkins's family, friends, and Jenkins himself made repeated requests for civil commitment to the Johnson County (Nebraska) Attorney. Jenkins stated to department employees "he wanted to be committed someplace to get mental help because he would kill people if he did not receive the mental help and was released."

Kruger alleged "[s]ometime in spring of 2013, ... Houston gave White a list of inmates ... and told him to change

all clinical recommendations from inpatient to outpatient treatment so that [the inmates] would be eligible for release from the Department." According to Kruger, Jenkins was on this list of inmates, so "White changed the recommendation on Jenkins from inpatient to outpatient treatment, which accelerated his release from the Department."

*2 Kruger also alleged that in the months before Jenkins's release, the Johnson County Attorney and the State's Public Counsel were investigating whether to pursue having Jenkins civilly committed upon his release. During this time, department employees met with the Public Counsel to discuss Jenkins. Dr. Mark Weilage, the department's Assistant Behavioral Health Administrator, spoke by phone with the Deputy Johnson County Attorney about Jenkins. No defendants ever disclosed Dr. Baker's evaluation—which, according to Kruger, could have provided a medical basis for civil commitment—during the meeting with the Public Counsel, the phone call with the Deputy County Attorney, or at any other time.

Kruger charged the defendants with "acting with deliberate indifference to Andrea Kruger's constitutional rights" by

a. Failing to properly enforce, apply, interpret, calculate, implement and comply with the rules, regulations, policies, procedures and laws regarding the detainment, sentencing, detention, incarceration, commitment and release of inmates.

b. Failing to properly comply with rules, regulations, policies, procedures and/or laws with respect to "good time" credited to inmates for good behavior while incarcerated.

c. Failing to deduct and/or alter "good time" credit from an inmate's sentence after the inmate had exhibited violent and/or insubordinate conduct during the inmate's term of incarceration and/or engaged in other conduct, which violates established policies, procedures, and/or rules.

In support of his state law negligence claim against the state, Kruger alleged the defendants "had a duty to Andrea Kruger in that ... [t]he magnitude of the risk of harm to Andrea Kruger was great as Nikko Jenkins had informed employees, contractors, officers and/or agents of the ... State of Nebraska that he intended to commit murders." Further, "[t]he State was the only entity that had the opportunity and ability to exercise care to protect Andrea Kruger by not releasing Nikko Jenkins," and it was foreseeable Jenkins would harm Kruger if he were released.

The original defendants removed the case to federal court. After Kruger amended his complaint, the state and the department officials moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), (6). The district court granted the motion, deciding the state and the department officials in their official capacities were immune from suit and Kruger failed to state a claim. First, the district court rejected Kruger's assertion that the defendants waived their immunity defenses by removing the case to federal court. The district court then dismissed Kruger's § 1983 claims against the state and the department officials in their official capacities because suits against state officials in their official capacity are actually suits against the state and states are not "persons" who may be sued for money damages under § 1983. The district court dismissed Kruger's § 1983 claims against the department officials in their individual capacities because "Kruger failed to plead that Andrea [Kruger] was deprived of a right secured by the Constitution and laws of the United States," as required to state a claim under § 1983.

*3 The district court dismissed Kruger's state law claims against the department officials in their individual capacities because the challenged actions undisputedly were taken "solely within the scope of their employment," which meant Kruger would have to comply with the STCA. *See Bohl v. Buffalo County,* 251 Neb. 492, 557 N.W.2d 668, 673 (Neb.1997). Finally, the district court dismissed Kruger's state law claims against the department officials in their official capacities because their actions fell within the discretionary function exception to the STCA's immunity waiver. *See* Neb.Rev.Stat. § 81–8,219(1). Kruger appeals.

## II. DISCUSSION

We review de novo the district court's ruling on a motion to dismiss. *See Christiansen v. W. Branch Cmty. Sch. Dist.,* 674 F.3d 927, 933–34 (8th Cir.2012).

### A. Section 1983 Claims

#### 1. Waiver

First, we address Kruger's assertion "the defendants have waived the sovereign immunity defense by removing this case from state court." Kruger asserts more generally that the defendants "waived any immunity defenses." Kruger relies

on *Lapides v. Board of Regents of University System of Georgia,* 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), a case in which state officials removed the plaintiff's state and federal claims against them in their personal and official capacities to federal court. The state then argued it was immune from suit in federal court under the Eleventh Amendment even though "a state statute had waived sovereign immunity from state-law suits in state court." *Id.* The Supreme Court rejected this argument, concluding a state may not remove a case to federal court and then attempt to assert immunity that would not have been available in state court. *Id.* at 619–20. The *Lapides* court explained its holding was limited "to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." *Id.* at 617–18. The *Lapides* court's decision itself does not necessarily apply to federal claims or state claims in which the state has not waived immunity in state courts. *See id.*

The fact that the defendants' removal of this case to federal court may have waived their Eleventh Amendment immunity from suit in federal court with respect to any state law claims for which the state had waived immunity in state court does not necessarily mean they waived their other immunities: sovereign immunity from state law claims for which the state has not waived immunity and qualified immunity from the § 1983 claims against the department officials in their individual capacities. Even if the state waived its Eleventh Amendment immunity, the defendants cannot be sued for money damages under § 1983 because claims against state officials in their official capacities are really suits against the state and a state is not a person for purposes of a claim for money damages under § 1983. *Id.* at 617; *see also, e.g., Will v. Mich. Dep't of State Police,* 491 U.S. 58, 65–66, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). ("The Eleventh Amendment bars ... suits [against States for alleged deprivations of civil liberties] unless the State has waived its immunity .... [A] suit against a state official in his or her official capacity ... is no different from a suit against the State itself."). To the extent Kruger attempts to appeal the dismissal of his § 1983 damage claims against the state and the department officials in their official capacities, we affirm the district court's dismissal of these claims.

### 2. Section 1983 Claims—Department Officials' Individual Capacities

*4 Kruger next contends "the individual defendants did not have qualified immunity [from Kruger's § 1983 claims] in their personal capacities." [5]

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct.... [A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Plumhoff v. Rickard,* 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (quoting *Ashcroft v. al-Kidd,* 563 U.S. ——, ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2001)). Kruger claims he met this test because "[a]t this stage of the proceedings, all allegations in the Second Amended Complaint must be taken as true. Kruger pled that [Andrea] had the constitutional right to freely associate and travel about the City of Omaha, and to not be deprived of that liberty interest by State actions."

As the district court explained, this is incorrect. Although the facts alleged in the complaint must be taken as true at this stage of the proceedings, they still must plausibly state a claim for relief. *See Bell Atl. Corp.,* 550 U.S. at 555–56. The district court was not required to take as true the dubious legal conclusions that there are constitutional rights to "freely associate and travel about the City of Omaha" which are " 'clearly established' " and of which "any reasonable official" would have been aware. *Plumhoff,* 572 U.S. at ——, 134 S.Ct. at 2023 (quoting *al-Kidd,* 563 U.S. at ——, 131 S.Ct. at 2074).

Kruger proclaims "the State had a duty to the public at large to not release a known and violent criminal." In fact, "there is no general substantive due process right to be protected against the release of criminals from confinement, even if that release violates state law." *Lovins v. Lee,* 53 F.3d 1208, 1209 (11th Cir.1995). Kruger's proclaimed duty is not clearly established.

There are two exceptions, neither of which applies here. First, the special relationship exception applies to limited

circumstances where "the Constitution imposes upon the State affirmative duties of care and protection with respect to *particular individuals*." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–99, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (emphasis added). This includes the duty "to provide adequate medical care to incarcerated prisoners" and "to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *Id.* at 198–99 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). *DeShaney* illustrates the narrow reach of this exception. *See id.* There, the Supreme Court rejected a § 1983 claim by a boy who alleged the county social services department knew he had been hospitalized repeatedly for suspicious injuries but took no action to protect him from his abusive father. *Id.* at 191–94. In that case, the Supreme Court reasoned,

> *5 nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.

*Id.* at 195.

The second exception is "the state-created-danger" exception. This exception would apply if Kruger showed:

> (1) that [Andrea] was a member of "a limited, precisely definable group," (2) that the [defendants'] conduct put her at a "significant risk of serious, immediate, and proximate harm," (3) that the risk was "obvious or known" to the [defendants], (4) that the [defendants] "acted recklessly in conscious disregard of the risk," and (5) that in total, the [defendants'] conduct "shocks the conscience."

*See Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir.2011) (quoting *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir.2005)). The district court found this exception did not apply because "Andrea was not a member of a limited, precisely definable group." *Id.* We agree with the district court's conclusion that "[m]embership in the general public" does not suffice.

Kruger asks us to "reconsider the state-created-danger doctrine," citing our decision in *Freeman v. Ferguson*, which involved a § 1983 claim by the estate of a mother and daughter who were murdered by the mother's estranged husband, despite an active restraining order. *See Freeman v. Ferguson*, 911 F.2d 52, 53–54 (8th Cir.1990). In that case, the police allegedly did not respond to the victims' reports of harassment because the police chief was friends with the perpetrator. *Id.* at 53–54. We reversed the district court's order granting a motion to dismiss to give the administrator of the decedents' estates "an opportunity to attempt to amend her complaint" in light of the *DeShaney* opinion, which had been announced only the day before the motion to dismiss was granted. *Id.* at 54. We pondered whether the analysis in *DeShaney* "establishe[d] the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action." *Id.* at 55.

The allegation here that the defendants increased the danger to the *general public* distinguishes this case from *Freeman*. *See, e.g., Davis v. Fulton County*, 90 F.3d 1346, 1351–52 (8th Cir.1996) (determining that duty jailer did not create a danger particular to an elderly shopkeeper who worked near the jail when the jailer permitted a pretrial detainee to go outside the jail to perform chores and the detainee raped the shopkeeper). In *Freeman*, the police allegedly deliberately ignored reports from *two individuals* who reported a danger from domestic violence that was specific to them. *Freeman*, 911 F.2d at 53–55. *Freeman* does not require we reverse the district court's order granting the defendants' motion to dismiss Kruger's § 1983 claims against the department officials in their individual capacities.

### B. State Law Negligence Claims

#### 1. Negligence Claims—Department Officials' Individual Capacities

*6 Kruger seems to have abandoned his state law claims against the department officials in their individual capacities. The district court correctly dismissed these claims because the department officials' actions were taken while they were acting in the scope of their employment, a fact Kruger himself pled. The STCA limits Kruger to proceeding against the department officials in their official capacities. *See Bohl*, 557 N.W.2d at 673; Neb.Rev.Stat. § 81-8,210(4).

### 2. Negligence Claims—Department Officials' Official Capacities

#### a. STCA Discretionary Function Exception

The district court dismissed Kruger's state law claims against the department officials in their official capacities upon concluding they did not fall within the STCA's limited sovereign immunity waiver. *See* Neb.Rev.Stat. § 81–8,219(1). The district court followed the defendants' arguments that Kruger did not allege the department officials "had no discretion (1) in failing to grant or withhold Jenkins' good time credits, or (2) in declining to pursue a civil commitment of Jenkins."

The discretionary function provision of the STCA provides:

> The State Tort Claims Act shall not apply to ... [a]ny claim based upon an act or omission of an employee of the state, *exercising due care,* in the execution of a statute, rule, or regulation ... or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion is abused.

Neb.Rev.Stat. § 81–8,219(1) (emphasis added). "[P]rotected under the [STCA] ... is the discretion of a governmental executive or administrator to act according to one's judgment of the best course to be taken.... [D]iscretion includes more than the initiation of programs and activities" and "includes determinations or judgments made in establishing plans, specifications, or schedules of operations." *Jasa ex rel. Jasa v. Douglas County,* 244 Neb. 944, 510 N.W.2d 281, 288 (Neb.1994).

The discretionary function exception "extends only to the basic policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions.... [T]he state is liable for negligence of its employees at the operational level, where there is no room for policy judgment." *Id.* Distinguishing a ministerial from a discretionary function involves a two-step inquiry. *Id.* at 289. First, does the conduct "involve [ ] an element of judgment or choice" or does a "statute, regulation, or policy specifically prescribe[ ] a course of action for an employee to follow"? *Id.* Second, if "the challenged conduct involves an element of judgment" is it "the kind that the discretionary function exception was designed to shield"? *Id.*

#### i. Discharge Date Calculation

The district court concluded the department officials' calculation of Jenkins's release date was a discretionary function because Nebraska statute § 83–1,107 provides that good time [6] "*may* be forfeited, withheld, and restored by the chief executive officer of the facility with the approval of the director after the offender has been notified regarding the charges of misconduct." Neb.Rev.Stat. § 83–1,107(3). The district court, relying on *Jasa,* 510 N.W.2d at 291–92, decided the use of the word "may" indicated that decisions about good time were discretionary and therefore the department officials were immune.

*7 On appeal, Kruger asserts his claim should not have been dismissed because he pled the defendants made an arithmetical error in calculating Jenkins's release date, which is a non-discretionary function. Kruger argues he alleged a mathematical error by pleading that the state "failed to properly *calculate* and/or apply 'good time.' " Kruger maintains "a defendant must serve the mandatory minium [sic] sentence plus ½ of the remaining minimum sentence before becoming eligible for parole." *See State v. Kinser,* 283 Neb. 560, 811 N.W.2d 227, 234 (Neb.2012) (declaring "good time credit would not reduce the ... mandatory minimum portion of [the defendant's] sentence"). "[G]ood time credit applies only after the mandatory minimum has been served" in part because the good time statute was intended "to ensure that no one would reach mandatory discharge before reaching parole eligibility." *State v. Castillas,* 285 Neb. 174, 826 N.W.2d 255, 267 (Neb.2013), *disapproved on other grounds, State v. Lantz,* 290 Neb. 757, 861 N.W.2d 728, 763 (Neb.2015). Jenkins may have been released too early in violation of the Nebraska Supreme Court directive in *Castillas.* [7] *See id.* However, it is impossible to determine based on the facts Kruger pled. His complaint alleged:

> While Jenkins had been sentenced to serve 21 years for his crimes, he was released from prison after serving 10 and ½ years. The State of Nebraska failed to properly calculate and/or apply "good time" for Jenkins

in ordering his release on July 30, 2013.

Kruger did not plead (1) what crimes Jenkins was convicted of, (2) whether those crimes carried mandatory minimum sentences, (3) what those sentences were, or (4) when Jenkins should have been eligible for release. Without this information, there is no way to evaluate the plausibility of whether a mathematical error occurred. Even if Kruger is correct in asserting that the discretionary function exception does not apply to mathematical sentence calculations, we conclude Kruger failed to plead facts stating a plausible claim for relief. *See Bell Atl. Corp.*, 550 U.S. at 555–56.

### ii. Psychiatric Report and Civil Commitment Decisions

Second, the district court determined the decision not to seek civil commitment for Jenkins was a discretionary function, citing Nebraska law providing:

> Any person who believes that another person is mentally ill and dangerous *may* communicate such belief to the county attorney .... If the county attorney concurs that such person is mentally ill and dangerous and that neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by a mental health board is available or would suffice to prevent the harm described in section 71–908, he or she shall file a petition as provided in this section.

Neb.Rev.Stat. § 71–921(1) (emphasis added).

On appeal, Kruger asserts the department officials had a mandatory duty to provide Dr. Baker's psychiatric evaluation of Jenkins to the Johnson County Attorney and the Public Counsel, thus making this duty a non-discretionary function. Kruger's argument that the department officials had a mandatory duty to provide the report to the county attorney is foreclosed by *Holloway v. State*, —— N.W.2d ——, ——, 293 Neb. 12, 20–26 (Neb.2016), in which the Nebraska Supreme Court determined the discretionary function exception applies to "[t]he decision whether to report to the county attorney that another person is thought to be mentally ill and dangerous."

*8 Kruger also proposes "[t]he State had a mandatory legal duty to turn over Dr. Baker's psychiatric report" to the Public Counsel. Nebraska Statute section 81–8,245(4) does provide the Public Counsel with "the power to ... [r]equest and receive from each administrative agency ... the assistance and information the counsel deems necessary for the discharge of his or her responsibilities" and declares the "agency *shall* provide" such assistance and information. (Emphasis added). The statute also grants the Public Counsel authority to "inspect and examine the records and documents of all administrative agencies notwithstanding any other provision of law." *Id.*

Kruger briefly mentions section § 81–8,245(4) only in his reply brief, so he has waived his argument based on that provision. *See, e.g., Mahaney v. Warren County*, 206 F.3d 770, 771 n. 2 (8th Cir.2000) (per curiam) ("Claims not raised in an initial brief are waived, and we generally do not consider issues raised for the first time on appeal in a reply brief."). Even if Kruger's cursory reference to section 81–8,245(4) were sufficient to raise the argument that the defendants had a non-discretionary duty to provide Dr. Baker's report to the Public Counsel upon the Public Counsel's request for documents, Kruger did not allege the Public Counsel ever made such a request. Consequently, Kruger did not plead facts that plausibly could support this proposition. *See Bell Atl. Corp.*, 550 U.S. at 555–56.

### b. Due Care Exception

Alternatively, Kruger suggests that even if the defendants' actions were discretionary functions, the discretionary function exception does not apply because it only applies to discretionary functions carried out with due care. *See Doe v. Omaha Pub. Sch. Dist.*, 273 Neb. 79, 727 N.W.2d 447, 458 (Neb.2007) (recognizing the existence of a statutory due care exception under Neb.Rev.Stat. § 13–910). We do not decide this issue because Kruger did not raise it before the district court. *See, e.g., Shanklin v. Fitzgerald*, 397 F.3d 596, 601 (8th Cir.2005) ("Absent exceptional circumstances, we cannot consider issues not raised in the district court.").

### III. CONCLUSION

The judgment of the district court is affirmed.

KELLY, Circuit Judge, concurring.

Unlike the "special relationship" exception, the "state-created-danger" exception is not extensively discussed in *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–99, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), but rather is circuit developed. While the elements of this judicially-created theory vary somewhat among the courts, in order to state a claim based on "state-created-danger," most require a plaintiff to articulate something like "a limited, precisely definable group" at risk. *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir.2011) (quoting *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir.2005)); *see also, e.g., Ray v. Owens*, 622 F. App'x 97, 99 (3d Cir.2015) (unpublished per curiam) (holding that harm must be "foreseeable and fairly direct" and there must be "a special relationship between the [victim] and the state"); *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 864–66 (5th Cir.2012) (en banc) (explaining that the Fifth Circuit has not adopted the theory, but has stated the "theory is inapposite without a known victim" (citation omitted)); *Guy v. Lexington–Fayette Urban Cty. Gov't*, 624 F. App'x 922, 933 (6th Cir.2015) (unpublished) (state-created danger requires special danger that affects "a few potential victims, not a few hundred."); *Jahn v. Farnsworth*, 617 F. App'x 453, 462–63 (6th Cir.2015) (unpublished) (state's actions must place plaintiff specifically at risk, as distinguished from risk that affects public at large); *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir.1989) (plaintiff distinguished from the general public); *Currier v. Doran*, 242 F.3d 905, 918 (10th Cir.2001) (plaintiff must be a member of a limited and specifically definable group). *See also Flint v. City of Belvedere*, 791 F.3d 764, 770–71 (7th Cir.2015) (no mention of public or group); *Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir.2012) (questioning usefulness of Tenth Circuit's test, including "limited and specifically definable group" requirement).

*9 I recognize that membership in the general public does not suffice to establish a limited, precisely definable group. *See Davis v. Fulton Cty.*, 90 F.3d 1346, 1351 (8th Cir.1996). Because Kruger has failed to plead anything more than a statement that the general public was at risk—Jenkins threatened to kill "people," "others," and "Christians, Jews, women and children" and "eat people, specifically Christians and Catholics"—I must concur in the opinion here as to Kruger's § 1983 claims. Yet I harbor some doubt as to the logic of our state-created-danger theory as it currently stands in the face of highly unusual circumstances such as are presented by this case. I would accept an invitation to revisit the elements required to support the theory because of the minuscule likelihood, under current law, that any plaintiff could ever succeed in proceeding beyond a Rule 12(b)(6) motion without an identifiable before-the-fact, named victim or a specific place to be targeted. Where the line should be drawn in determining when a group is "precisely definable" enough to establish liability is a question worth examining. Should pleading danger to "anyone Jenkins comes into contact with" suffice to establish a precisely defined group? Should "any child Jenkins encounters"? Or must it always be as specific as an "ex-wife" or "John Smith"?

The lack of a consistent or decisive answer to those questions that makes sense in every factual scenario makes it troubling to dismiss this type of case at such an early stage. This is especially so here: If you consider the possibility that the other elements of the "state-created-danger" theory are met, the duty of the State would likely be the same whether there was a named victim or not—to civilly commit Nikko Jenkins. Therefore, I question, under circumstances such as these, whether the simple public-versus-precisely-definable-group dichotomy is a useful one, and I would not find it inconsistent with *DeShaney* to rethink or refine it. Nor would such refinement necessarily be foreclosed by *Martinez v. State of Cal.*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (Defendant was "not aware that [the] decedent, as distinguished from the public at large, faced any special danger."). Moreover, the changes the court could reasonably consider would not open the floodgates to liability and litigation, for each of the other elements for establishing the "state-created-danger" theory in support of a § 1983 claim is a near-impossibly high hurdle, and all must be met. For instance, Kruger also needed to plead that the defendants' "conduct put her at a significant risk of serious, immediate, and proximate harm," and courts analyze with great scrutiny whether state actors' conduct constitutes action or inaction. *Fields*, 652 F.3d at 891 (quoting *Hart*, 432 F.3d at 805); *see also, e.g., Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir.2005); *Doe v. Rosa*, 795 F.3d 429, 440 (4th Cir.2015). The risk must also be obvious or known to the defendants, and there must be a reckless, conscious disregard of that risk. Finally, the defendants' conduct must shock the conscience—yet another extremely high standard to meet. *See, e.g., Flint*, 791 F.3d at 770 ("Though the standard lacks precise measurement, only conduct falling towards the more culpable end of the tort law spectrum of liability is constitutionally conscience-shocking ... neither bad decision-

making nor grossly negligent behavior meets the stringent test." (internal quotation marks and quotation omitted)).

**\*10** Establishing a constitutional violation in this setting may be more difficult than bringing a claim based on state tort law that the state could very well expand, and understandably and justifiably so. *See DeShaney,* 489 U.S. at 203 (noting that the State may change tort law if the people wish to expand liability); *Rivera,* 402 F.3d at 35–36 ("[C]ourts must be careful to distinguish between conventional torts and constitutional violations." (quoting *Soto v. Flores,* 103 F.3d 1056, 1064 (1st Cir.1997))). Yet the merits of these few and far between claims are worth considering, and not dismissing out of hand. While tragic circumstances themselves must not dictate judicial outcomes adverse to the law, it is precisely the unusual fact pattern that can challenge the wisdom of reflexively rejecting a claim that does not quite fit into the current legal mold. This may be such a case, and one in which we have the opportunity to reevaluate, within the bounds of Supreme Court precedent, the efficacy of that current mold.

**All Citations**

--- F.3d ----, 2016 WL 1376343

## Footnotes

1. The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.
2. The district court referenced Rule 12(b)(3), a venue clause; however, we believe the district court meant Rule 12(b)(1).
3. We have jurisdiction pursuant to 28 U.S.C. § 1291.
4. Because this appeal arises from dismissals under Federal Rule of Civil Procedure 12(b)(1), (6), we take our "facts" from Kruger's complaint allegations to determine if Kruger has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 677–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
5. In his reply brief, Kruger briefly mentions "[s]ince Defendants have failed to file an Answer with respect to [their qualified-immunity] claims, the Court was premature in dismissing the Complaint." We do not consider this argument because Kruger did not raise it in his opening brief. *See Barham v. Reliance Standard Life Ins. Co.,* 441 F.3d 581, 584 (8th Cir.2006).
6. "Good time means any reduction of sentence granted pursuant to sections 83–1,107 and 83–1,108," which includes automatic reductions and reductions for good behavior. Neb.Rev.Stat. §§ 83–170, 83–1,107, 83–1,108.
7. This problem was not unique to Jenkins. A special investigative committee reported that over 300 inmates were released too early because the department failed to comply with the *Castillas* decision. *See* Nebraska Department of Correctional Services Special Investigative Committee Report to the Legislature 46–51 (Dec. 15, 2014).

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.