1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     TARA L. LONG and TODD J. LONG,
      Administrators of the Estate of
4     TAMMY E. LONG, Deceased,
                    Plaintiffs,          Civil Action 15-1477
5        vs.

6     ARMSTRONG COUNTY, d/b/a
      ARMSTRONG COUNTY JAIL, and
7     DAVID HOGUE,
                    Defendants.

8

9         Transcript of Oral Argument Proceedings on Thursday,
   February 25, 2016, United States District Court, Pittsburgh,
10 PA, before Mark R. Hornak, District Judge.

11 APPEARANCES:

12   For the Plaintiffs:            George M. Kontos, Esq.
                                    Claire McGee, Esq.
13                                  KONTOS MENGINE LAW GROUP
                                    Two Gateway Center
14                                  Suite 1228
                                    Pittsburgh, PA  15222
15

16
     For the Defendant:            David J. MacMain, Esq.
17                                  MacMAIN LAW GROUP LLC
                                    101 Lindenwood Drive
18                                  Suite 160
                                    Malvern, PA  19355
19

20
   Court Reporter:                 Juliann A. Kienzle, RMR, CRR
21                                  5300 U.S. Courthouse
                                    700 Grant Street
22                                  Pittsburgh, PA 15219
                                    (412) 261-6122
23

24
         Proceedings recorded by mechanical stenography;
25 transcript produced by computer-aided transcription.

1  (Proceedings held in open court; Thursday, February 25, 2016.)

2          THE COURT:  We're here today in the case of Tara L.

3  Long and others, plaintiffs, versus Armstrong County,

4  Pennsylvania, and others, defendants.

5          Will counsel for the plaintiff please enter their

6  appearance.

7          MR. KONTOS:  George Kontos on behalf of the

8  plaintiff.

9          MS. McGEE:  Claire McGee on behalf of the plaintiff.

10          THE COURT:  Good morning, Mr. Kontos.  Good to see

11  you.

12          Good morning, Ms. McGee.  Nice to see you.

13          Will counsel for the defendant please enter his

14  appearance.

15          MR. MacMAIN:  Good morning, Your Honor.

16  David MacMain with the MacMain Law Group for the defendants

17  Armstrong County and Hogue.

18          THE COURT:  Good morning to you, Mr. MacMain.  Safe

19  travels in from Philadelphia?

20          MR. MacMAIN:  I drove yesterday, made it halfway to

21  Carlisle and finished the trip today.

22          THE COURT:  We're here today to hear oral argument

23  on the motions to dismiss that have been filed on behalf of all

24  the defendants.

25          Mr. MacMain, as I understand your motions, if they

1  would be granted, it would completely conclude the case.

2          Is that correct, sir?

3          MR. MacMAIN:  It would, Your Honor.

4          THE COURT:  So, Mr. MacMain, since you represent the

5  moving parties, we'll hear from you first.

6          And we'll make sure Mr. Kontos and Ms. McGee have

7  plenty of time to address the Court, then we'll give you any

8  rebuttal.

9          Counsel is welcome to present seated or standing at

10 counsel table.  You can also use the podium.  If you do use the

11 podium, there's a little toggle switch on that microphone that

12 will turn the green light on so we can hear you.  If you stay

13 at counsel table just adjust the microphone so they work for

14 you.

15         With that, Mr. MacMain, we'll recognize you for your

16 presentation.

17         MR. MacMAIN:  I think I will stay at counsel table.

18         As Your Honor knows, what is before the Court is a

19 motion to dismiss in which we've accepted as true all of the

20 facts as pled in the complaint.  Even accepting all those facts

21 as true, we believe as a matter of law, the claim simply does

22 not -- is not legally viable.

23         I begin, Your Honor, by saying I'm mindful, my

24 clients are mindful this is a sad and empathetic case.  I had a

25 chance to meet Ms. Long's daughter just before we began.  I'm

certainly mindful of the tragic circumstances that bring us here today.  However, the DeShaney case, which is the seminal case which sets forth the state-created danger claim, which is what the case is pled under, the Supreme Court cautioned that judges and lawyers, like other human beings, are moved by natural sympathy in a case like this to find a way for the family to receive compensation for the grievous harm inflicted. But before yielding to that impulse, it is well to remember, once again, that the harm was inflicted not by the defendants but by Mr. Crissman in this case.  I begin by noting that because we do come to this argument, to this case with a recognition that the facts certainly are compelling and sad.

Under the state-created danger claim, however, Your Honor, there are four elements that have to be proven.  I'm going to address three of them.  The fourth one I'm going to concede for purposes of the motion.

Those elements are the harm had to be foreseeable and fairly direct.

Second, the conduct of the defendant has to be conscious shocking.

Third, there needs to be a special relationship where someone has to be in a discrete class of persons.

And, fourth, there had to be an affirmative act as opposed to a failure to act which caused the harm in the case.

I'm going to address the first three, the fourth

1   one, Your Honor, again, I'm going to concede for purposes of

2   the motion.

3             The first element, that the harm be foreseeable and

4   be fairly direct.  The language that cases talk about is it

5   must be actual knowledge, has to be a sufficiently concrete

6   risk.  There has to be a fairly direct harm.  The plaintiff

7   must show that the actions of the defendant was the catalyst

8   for harm when the defendant's actions versus omissions are

9   separated from intervening forces which are not fairly direct.

10             In this case, Your Honor, even accepting the facts

11  as pled by plaintiff, we have a whole series of steps, a whole

12  series of events, none of which collectively or even

13  individually or collectively were foreseeable.  It's not

14  foreseeable that this particular inmate, who had been in the

15  facility numerous times before without incident or problem or

16  risk had no history of violence, would escape.

17             It's not foreseeable --

18             THE COURT:  Isn't it foreseeable or couldn't it

19  factually be foreseeable that he would escape?  It might not be

20  foreseeable that he would cause the harm.  If he's been a

21  placid person when he's been in jail, was he ever in a

22  position, does the complaint plead that he was previously in a

23  position where he had unescorted access outside the walls or

24  the fencing of the jail?

25             MR. MacMAIN:  Well, I think he has.  I'm not sure if

1   that's within the four corners of the complaint, so I don't

2   want to argue facts, but even accepting that it is foreseeable

3   that an inmate could escape, I guess that's always foreseeable,

4   we have additional things that before we get to the ultimate

5   harm and that is that he would escape, he would remain in the

6   area, he would go to this specific home, that he would know the

7   occupants of this home, that the occupants of this home would

8   invite him in, that one of the occupants of the home would

9   leave the home, leaving the inmate with Ms. Long, and that

10  additionally that he would then commit this heinous act of

11  violence.  So, there are a whole series of things, all of which

12  would had to have been foreseeable to meet the definition of

13  the first element, and that is the harm has to be foreseeable

14  and fairly direct.  In this case, there are many intervening

15  factors, there are many unforeseen things that occur, and as a

16  result, I think even under the facts pled in the complaint, the

17  first element of the state-created danger claim wouldn't be

18  met.

19          The second element is the behavior has to be --

20  first of all, it has to be affirmative behavior as opposed to

21  failing to act.  I think that the argument really and the claim

22  here is that the prison and/or under the auspicious of Warden

23  Hogue didn't do enough, there was a failure to act as opposed

24  to an action, didn't have enough security, didn't screen

25  carefully enough, didn't have a fence around the prison, all

1 the things that are not affirmative acts but failures to act.

2          THE COURT:  Even if all of those would be drained

3 out of the complaint, let's assume Mr. Kontos never pled any of

4 those, doesn't he get there on that burden by saying the jail

5 had a program where they chose to let guys outside the fence

6 without a guard.  They chose to do that.  So, whether or not

7 they should have had higher fences or should have screened

8 Crissman or should have evaluated him better, isn't the guts of

9 the plaintiff's case that it's just outright dumb, if you will,

10 to let people roam around who are in jail, to let them roam

11 around outside the jail without escorts?

12          MR. MacMAIN:  Well, I think that that's the gist of

13 the complaint.  That was actually addressed and rejected in the

14 Russell case where the very same -- almost identical and

15 actually more heinous facts, I would argue, in the Russell

16 case, the Third Circuit rejected that.  Not doing enough, not

17 having enough security, having lax security simply doesn't meet

18 the element that is necessary for the state-created danger.

19          So, in terms of the second element --

20          THE COURT:  Under that theory, if the state, whether

21 it's the state or one of its units of government said, you know

22 what, one of the most expensive things about jails is walls and

23 fences, so we're just not going to have those.  We'll have a

24 bunch of cameras and we'll kind of keep an eye on everyone.

25 You can always recast doing an affirmative act as being the

1   non-doing of a negative act, and the failure to do something

2   can be recast the other way around.  So isn't that a bit

3   semantic?  Under your theory, a county could say, you know

4   what, we'll really save a lot of money, we're going to have no

5   walls, no fences and, in fact, we'll just have one guard and

6   we'll put her or him up in a really tall booth with a lot of

7   cameras and we'll give him a phone.

8             That would be a failure to act, if we don't have

9   walls, we don't have guards.  But isn't it also an act because

10  the people running the show have elected to do things a certain

11  way.  So, isn't it also an affirmative act?

12            MR. MacMAIN:  Well, I suppose if you have all of

13  those factors, that extreme amount of factors, I think the

14  argument --

15            THE COURT:  Isn't it implicit in the complaint that

16  somewhere along the way someone at the jail said, you know,

17  we're going to decide not to send guards with these tray

18  fellows while they're out picking the food up out of the van.

19  So, yes, it's a failure to not have a guard standing there, but

20  isn't it also an affirmative decision that was made to not have

21  a guard standing there?

22            MR. MacMAIN:  I suppose if it was recast in that

23  light, I suppose it could be.  I suppose any decision not to do

24  something could be categorized as an affirmative act.  But I

25  think typically under the Russell case where these very same

allegations were made and the court rejected it, as really in
the primary instance, it's a failure to act as opposed to an
action.  So, I suppose if you have all these factors, Your
Honor, I think a more compelling argument could be made.  I
don't think that's the case here.

THE COURT:  Okay.

MR. MacMAIN:  The second element shocks the
conscience.  I think we started to talk about that a little
bit.

The reason that the court, the Supreme Court in
DeShaney and its progeny has set the bar so high as conscious
shocking behavior, conscious shocking behavior being something
so outrageous, so out of the norm, so troubling, the reason the
bar is set so high is one could always say, government could do
more.  Police officers --

THE COURT:  Is that a question of law or a question
of fact?

MR. MacMAIN:  Well, I think in the first instance,
it's a question of law.  Again, I'm even accepting the facts as
pled by plaintiff in their complaint.  We don't necessarily
agree all the facts are accurate, but I think even accepting
all those facts as true, I don't think it reaches, under the
case law, including other escapes and parolee cases, reaches a
level of conscious shocking behavior.  So even accepting
plaintiff's facts as true, it does not reach that legal

1 threshold that is necessary on these claims.

2          I'm going to turn to the third element, which I

3 think is the one, of the three --

4          THE COURT:  How do I determine whether something

5 shocks the conscience?  Am I to determine -- and I don't want

6 this to be simplistic, but is it something that would cause a

7 jury to say, what, they did what?  Something more than that?

8 Something less than that?

9          MR. MacMAIN:  Well, that's a good question.  I think

10 certainly negligence doesn't cut it.  Gross negligence doesn't

11 cut it.  I think within both briefs there is some description

12 of what conscious shocking behavior -- I think the simplistic,

13 my God, you're kidding me, in plain English, when I described

14 to my clients conscious shocking in general, and see what do

15 they think, it's kind of, I think, a common man definition.

16          THE COURT:  At least it's a starting point to that,

17 to exploring that concept.

18          MR. MacMAIN:  I think that's right.

19          So turning to the third element, this is the one

20 where I want to spend the most amount of time is the

21 state-created danger requires some type of special --

22          THE COURT:  You're welcome to use all the time you

23 want.  I thought you would use the least time and you would

24 say, Judge, read Martinez, read Russel, you're a district

25 judge, they're from the Supreme Court and the circuit, you have

1  no choice.

2           Isn't that kind of your argument in your brief?

3           MR. MacMAIN:  It really is.

4           I'll just briefly respond to plaintiff's argument

5  that you shouldn't look at Russell and you shouldn't look at

6  Martinez and you shouldn't look at a whole laundry list of

7  cases because they predate DeShaney is the thrust of the

8  plaintiff's argument.  However, these cases all talk about

9  special relationship, which is the element, the third element

10 of the state-created danger, which DeShaney recognized for the

11 first time.  So, with the Russell case, for example, and I'm

12 going to touch on it briefly, you had almost identical facts

13 here, as in here, a case in the Middle District, Potter County

14 Prison where the very theories were, well, the inmate was in

15 for homicide, burglary, theft and robbery.  The allegation

16 was --

17          THE COURT:  If anything else, he was higher up the

18 felon --

19          MR. MacMAIN:  Certainly.  I mean certainly there was

20 arguably more notice to the prison officials.  This was a

21 violent guy, this was a guy who was capable of violent acts

22 and, in fact, committed violent acts.

23          The allegations were similar here, that the prison

24 didn't do enough, they didn't do a head count, locks weren't

25 operable, they have been told -- this is where it is even more

egregious than this case, they had been told by the Department
of Corrections in prior inspections that their security was
problematic.

The guy escaped, kills a husband and wife, and the
court held a number of these, one, there was no special
relationship.  I think there are two things particularly
applicable here and that is that it held that a resident of the
community, even those that lived near the prison are part of
the members of the public at large.  There's no discrete class
that you live near the prison, you now have -- that the state
has a different relationship or special relationship with them.

The second thing that the Third Circuit held, and
this goes to plaintiff's secondary argument, and that is, well,
the inmate really is just an agent of the state, so Armstrong
County, whatever the inmate does as an agent, they're
responsible for.  The Russell case said very specifically, an
inmate is not an agent of the state, they're an inmate.

THE COURT:  But even if he was an agent of the
state, unless he's a final decisionmaker, he can't bind the
state because Monell says there's no respondeat superior in
1983 cases.

MR. MacMAIN:  Correct.

THE COURT:  So if we take this out of being an
inmate, we make it the captain of the guards, and he leaves the
jail in uniform and kills somebody at the filling station

1  catercorner from the prison, it would be horrific, but that

2  doesn't make the county liable because there's no respondeat

3  superior.

4          MR. MacMAIN:  Right.  Certainly that act would be

5  far outside what you would expect, what a guard is authorized

6  to do.

7          The special -- the public function test or the state

8  actor argument also fails.  It's really applicable when the

9  government subcontracts to some private entity to fulfill a

10  governmental function.  For example, one of the prisons has a

11  medical company they use to perform the function, provide

12  medical care.  I represent children and youth agencies,

13  sometimes they'll subcontract out to a private social agency to

14  perform counseling and --

15          THE COURT:  Emergency medical services, those sorts

16  of things?

17          MR. MacMAIN:  Exactly.  That's what the public

18  function test is intended to apply to, not an inmate.

19          So, picking up on the signal that I don't need to

20  argue --

21          THE COURT:  You're welcome to, but --

22          MR. MacMAIN:  But I think the cases are pretty

23  clear, and this is where DeShaney comes in, it's unfortunate,

24  but there is no special relationship between -- in this

25  particular case, under these facts, and for those reasons, Your

1  Honor, even as a matter of law, even accepting the facts as
2  pled in plaintiff's complaint, which are troubling, there's
3  simply not a viable, legal cause of action.
4          THE COURT:  Under the Constitution.
5          MR. MacMAIN:  Under the Constitution.
6          THE COURT:  Which is what is pled here.
7          MR. MacMAIN:  Right.
8          THE COURT:  Thank you very much, Mr. MacMain.
9  You're deemed to have reserved time for rebuttal, if you choose
10 to use any.
11         Mr. Kontos, sir, happy to hear from you.
12         MR. KONTOS:  Thank you, Your Honor.
13         I want to jump around a little bit and just stay
14 with the third prong.  One of the things I want to point out is
15 the idea and the conflation of the principles, the
16 constitutional principles that defense counsel mixes up.  He
17 talks about special relationship.  And special relationship, of
18 course, came about as a result of the DeShaney case.  That was
19 the footnote that Justice Brennen put in there.  That really
20 applies to a custodial situation or special relationship where
21 the state finds itself in a peculiar situation with a victim,
22 oftentimes it's an inmate because they are devoid of the
23 ability to care for themselves.  That's different than the
24 relationship prong that Kneipp set out when the Third Circuit
25 adopted the state-created danger theory.

1            THE COURT:  Hasn't every district court that has

2   applied Kneipp since Kneipp continued to affirm the vitality of

3   Russell?  Certainly isn't Martinez still good law, which is

4   from the Supremes.

5            MR. KONTOS:  Martinez is still good law.  I'm not

6   suggesting that it isn't.  But Martinez is very different.  In

7   fact, Martinez and the parolee cases, as I would call them, are

8   still viable.  I'm not suggesting that plaintiff -- plaintiff

9   isn't suggesting that that's not good law, but they are wholly

10  distinguishable and analyzed under a different rubric than what

11  the Third Circuit set forth in a case such as this.  In

12  Martinez and those parolee cases, there is a great length of

13  time, typically, that goes between the decision to release the

14  person and then the crime that takes place; oftentimes months,

15  oftentimes within great distances.  That's very significant

16  because I think it gets back to the idea of foreseeability.

17  But there's no doubt that the defense relies almost exclusively

18  on Russell.  Russell was not using the same type of analysis

19  that the Third Circuit has adopted since Kneipp, which has been

20  confirmed in Morse and Bright in which the Third Circuit

21  expanded the third prong of the state-created danger theory

22  beyond just a specific individual and the idea of whether or

23  not a person is part of the general public or not.  Those cases

24  basically said that a foreseeable, identifiable plaintiff could

25  be a member of a discrete class.  So that was something that

1  was not available to Russell at the time that Russell was

2  decided.

3          I should point out, as we do in our brief --

4          THE COURT:  But we know that Kneipp did not overrule

5  Russell because one, it didn't say it did, and secondly, a

6  panel of the Court of Appeals can't overrule a prior

7  precedential decision of another panel.

8          MR. KONTOS:  I'm not suggesting -- we're not

9  suggesting that Russell has been overturned, but with respect

10 to the analysis in this case, and the analysis that should be

11 used, certainly, the Third Circuit has set forth a different

12 rubric than that that existed at the time of Russell.

13         THE COURT:  Do you have any case from a district

14 judge in this circuit that stands for the proposition that

15 Kneipp modified, fine tuned, amended, clarified Russell?

16         MR. KONTOS:  Certainly the Third Circuit in the

17 Morse case discussed at length the third prong and the analysis

18 to be used.

19         THE COURT:  Did they talk about Russell?

20         MR. KONTOS:  Well, they don't talk about Russell,

21 but in Russell, and I'll demonstrate at least from our

22 perspective why the analysis that the defense suggests is

23 inapplicable in this situation.  In Russell, the court cited

24 approvingly a case from the Sixth Circuit, the Nishiyama case.

25 In Nishiyama, you had a trusting situation.

1            By the way, I should just digress for a moment.  We

2  are talking about cases like Russell, and talking about inmates

3  and talking about foreseeability.  It's very different than

4  being an inmate.  An inmate is something entirely different

5  from a trustee for all the things that you alluded to in your

6  questioning at the beginning of the defense argument, which is

7  the state has to take some affirmative action in conferring

8  that privilege and status upon a prisoner when they make he or

9  she a trustee.  It's different than just an inmate.  You talk

10  about the nomenclature issue as you discussed at length in your

11  Benedict opinion, which is, you can characterize something as

12  the failure to act, or action, and, of course, those semantical

13  issues arise, as Your Honor noted in that opinion.  But in this

14  case, you can throw all of that out.  The example that you gave

15  about, well, the prison wants to cut costs so it doesn't do

16  this and it doesn't do that.  Here, we have an affirmative act

17  on the part of the state.  They confer this.  Realizing, too,

18  that society through the legislature has said, we want to

19  incarcerate these prisoners, they're to be devoid of their

20  freedom, all that kind of stuff, and the state, through the

21  prison, makes the decision to confer the special status and

22  give them those privileges.  That's action.  There's no

23  nomenclature, there is no semantical issue with that.  That was

24  not the case in Russell.  Russell was a prisoner.  A lot of

25  these cases were prisoners.

1          THE COURT:  Crissman was a prisoner also.  The point

2   in Russell was they had flimsy locks, any Tom, Dick or Harry

3   would know you can stroll out the back door, so I don't know

4   that that's the distinction between Russell and in this case,

5   Crissman being outside the wall with the food trays.

6          MR. KONTOS:  The court in Russell, I would suggest

7   to Your Honor --

8          THE COURT:  Russell assumed the prison was a sieve.

9          MR. KONTOS:  I think that Russell did put

10  significance on that because at the end of the decision,

11  Russell cites with approval and points out the situation where

12  liability under Section 1983 would happen.  That's in

13  Nishiyama.

14         THE COURT:  Nishiyama was overruled by the Sixth

15  Circuit, wasn't it?

16         MR. KONTOS:  I'm talking about Russell's analysis

17  and its reliance on that.  In that situation, there was a

18  trustee situation, it wasn't just a prisoner.  He was given

19  instrumentality from the state to effect his crime and the

20  victims in that situation were remote.  If you look at the

21  cases post-Russell in the Third Circuit that deal with the

22  analysis of that third prong in terms of an identifiable

23  plaintiff, I think --

24         THE COURT:  The only one we could find is Chief

25  Judge Kane's decision in Fleckenstein where she goes through

1 seven or eight specific prior relationships between the victim

2 and the prisoner.  It was a specific one-on-one tie-in.

3           MR. KONTOS:  I think a case that is instructive to

4 the Court would be the Morse decision in which the court --

5           THE COURT:  In which Judge Scirica said there was no

6 claim under the state-created danger.

7           MR. KONTOS:  He did, but he did not analyze the

8 third prong.  In Morse, the reason was -- and that's a case of

9 course, in which there was a school, they propped open a door.

10 So there was no affirmative conduct, it's all sort of failure

11 to act.  There was no allegation the court said in that case,

12 there was no allegation that they had any idea that that person

13 had any violent propensities.  It was a mental patient.  The

14 court did not get to the third prong.

15           THE COURT:  Where in your complaint is the

16 allegation that the defendants here had knowledge that Crissman

17 was violent?

18           MR. KONTOS:  It is replete with that, Your Honor.

19 It's replete insofar as he had a history of breaking and

20 entering, that he had a history of theft, that he had multiple

21 instances --

22           THE COURT:  People steal stuff from Target every

23 day, they're not violent, they're dumb, they're greedy.  That

24 would make every crime a crime of violence.

25           MR. KONTOS:  I would suggest that it wouldn't.  It

1 is a fact --

2         THE COURT:  Bernie Madoff stole $4 billion.  That's

3 a theft of almost unparalleled nature.  Is that a crime that

4 shows that Mr. Madoff had violent propensities?

5         MR. KONTOS:  Perhaps it doesn't, but I would

6 respectfully submit to this Court that a person that has a

7 long-settled history of drug abuse that affirmatively tells the

8 people that are in charge of him, I'm going through drug

9 withdrawal, he tells that to them, they had actual knowledge of

10 that.  You take upon that and --

11         THE COURT:  Once a week I have men and women sitting

12 in that chair right next to Mr. MacMain who have long histories

13 of severe drug dependencies.  There's absolutely nothing in

14 their record -- in fact, they're on bond, not in any custody.

15 There's nothing in their record that reveals that they're

16 violent.

17         MR. KONTOS:  I would agree with you that that

18 happens let's even say 90 percent of the time.  But it is

19 foreseeable that 10 percent of the time somebody with a

20 long-term drug problem going through the throes of heroin

21 addiction in terms of how desperate one might feel, knowing

22 that they have a history, not of murder but of breaking and

23 entering, breaking into someone's home, entering into someone's

24 home, and the people that are supposed to make the decision as

25 to whether or not to confer special status and give this person

1  access outside of the jail, is it foreseeable that that person

2  in that situation with that background could conceivably take

3  desperate measures --

4         THE COURT:  Let me ask you this.  If that's the way

5  you phrase it, Mr. Kontos, isn't it at least Mr. Hogue, isn't

6  he absolutely immune under Taylor v. Barkes and under Luna,

7  because unless you can show that there's a decision of the

8  U.S. Supreme Court or a consistent, longstanding body of

9  precedent that says in that specific circumstances Hogue should

10 have known this would happen, isn't he absolutely immune?  So

11 he's out of the case anyway?  Not absolutely immune, qualified

12 immunity.

13        MR. KONTOS:  I don't think that it can be said that

14 he didn't understand that that was violative of somebody's

15 constitutional principles.  Would he not --

16        THE COURT:  No, but I'm obligated under Taylor and

17 I'm obligated under Luna to define with precision the

18 Constitutional right.  And that would, it sounds to me, that a

19 warden who would know that -- every warden, in fact, under

20 Al-Kidd, the standard is every -- I have to conclude that the

21 right was so clearly established that every public official in

22 the same position would have known that having a heroin addict

23 with a theft record as a trustee would violate the

24 Constitutional rights of Ms. Long and her estate.

25        MR. KONTOS:  I would add something to that, Your

1  Honor.  I'll add this.  Perhaps that's not actionable as you've

2  stated it, but add to that --

3          THE COURT:  I'm not saying I like it, but isn't that

4  the law?

5          MR. KONTOS:  Let me add something to it, though.  If

6  you add that same scenario and you add to it the prisoner says,

7  I am actively going through heroin withdraw and your policy,

8  Warden, is that this program, as we have pled, is only for DUI

9  and people that failed to pay their child support.  There's a

10 reason for that.  There's a reason for that because it's

11 foreseeable that only the most vanilla of criminals should even

12 be considered for the status.

13         So, I would suggest that if you tweak your suggested

14 set of facts and you add to it that there's a policy that says,

15 only DUI and only child support violators are to even be

16 considered, which we pled and which was, in fact, the case, you

17 add to it that somebody like Crissman says, I just took heroin

18 24 hours ago and I'm actively going through heroin withdraw, I

19 think if you add that to it, I think at this stage, that --

20         THE COURT:  Was there anything in the record?  Was

21 there anything in the complaint, the fact that somebody is

22 going through heroin withdrawal gives them a propensity for

23 violence?

24         MR. KONTOS:  Well --

25         THE COURT:  Doesn't it give them propensity for

1 being violently ill?

2 MR. KONTOS:  Perhaps.  Again, if you state it only

3 that way, that's the case.  But that's not the only thing we've

4 pled.  It's not just the person who is going through heroin

5 withdraw, it's a person who is going through heroin withdraw

6 that has a 15-year record of being in and out of this

7 institution, violating parole, and he has a history of breaking

8 and entering, and theft, crimes that cannot be, I think when

9 taken in the light most favorable to the non-movant, to be said

10 and devoid of the propensity for serious --

11 THE COURT:  Theft does not have as an element any

12 form of violence, physical violence against a person or

13 property.  Theft is walking into the 711, peeking around at the

14 cameras and putting a Milky Way in your pocket.  That's theft.

15 It's also what Bernie Madoff did.  There are all various

16 permutations of it.

17 MR. KONTOS:  Bernie Madoff did not break and enter

18 into somebody's home, and I would suggest to you that that is a

19 criminal act that cannot be said to, in all instances, be

20 devoid of all violence.  That was also in his history.  I think

21 when you take all those things, it can be said that this was

22 not something that was completely unexpected.  And the idea

23 somehow --

24 THE COURT:  Mr. MacMain I think will in a moment,

25 tell me, Judge, it was completely unexpected because he had

1   been in our jail repeatedly and we never had any problems with

2   him.

3          MR. KONTOS:  That's like saying there's a reason in

4   a motor vehicle accident case you don't say this person has

5   never had an accident before, this has never happened before.

6   If that was the standard, the first time that anyone did

7   anything would not be actionable.  The foreseeability is a much

8   more involved analysis.

9          THE COURT:  But you're not arguing foreseeability,

10  you're arguing propensity.  You're saying this is a permissible

11  use of the doctrine of propensity, which is otherwise kept out

12  of the law because we judge people's conduct on each occasion.

13  But you're saying, legitimately, the jail should have foreseen

14  he had a propensity for violence.

15         MR. KONTOS:  Yes.  I think as pled, and taking the

16  facts as pled in the light most favorable, certainly.

17         The defendants say he's not a violent criminal, he's

18  not a violent criminal.  Well, I think if you look at all these

19  things and you look at what he said --

20         THE COURT:  Mr. MacMain, I don't know that he went

21  that far.  What he said in his papers was he had been in the

22  jail before, they didn't have any problems with him.

23         MR. KONTOS:  He said that he had never been arrested

24  for a violent crime before.

25         And he also said the foreseeability is somehow

1 vitiated because the Longs invited, invited Crissman into their

2 home.  That is such a gross distortion that somebody could

3 invite somebody when he under deception or by using deception,

4 aided, by the way, by the conduct of the state.

5              But I want to get back --

6              THE COURT:  Whoa, whoa, whoa.  There the nothing in

7 the complaint that says Crissman forced his way into the home

8 in any way.  He play have lied, but --

9              MR. KONTOS:  Absolutely not.  We didn't say that he

10 forced his way into the home.

11              What we have said is that the state, through his

12 action, aided his ability to deceive Ms. Long to get into her

13 home.

14              THE COURT:  How?  How is that pled?  What is pled in

15 that regard?

16              Mr. Kontos, I don't want you to get the wrong

17 impression.  This is an absolutely horrific case, but you're

18 asking me to thread the needle between a binding decision in

19 the U.S. Supreme Court and a precedential decision of the Third

20 Circuit, and maybe there is some daylight there, but I'm stuck,

21 as would every U.S. District Judge in the circuit be bound, I'm

22 bound by Martinez, I'm bound by Russell, and unless there is

23 some daylight, I have to apply them.

24              MR. KONTOS:  Well, I want to answer your question,

25 then I'll get back to that.  With respect to what was pled, in

1 our brief, we specifically go through all of the very detailed

2 allegations that meet --

3          THE COURT:  How did the state aid Crissman into

4 getting into the Longs' residence, other than he was able to

5 not be in the jail?

6          MR. KONTOS:  Well, that's significant, of course,

7 that he was -- they conferred this trustee status upon him,

8 which gave him this access to the outside that allowed him to

9 essentially walk off.

10          But the other thing they did that was active was

11 that they made the decision to give him civilian street

12 clothes.  That's pled in the complaint.  If he had been wearing

13 a standard issue inmate uniform that said Prisoner on it, taken

14 in the light most favorable to the --

15          THE COURT:  Nobody in a federal prison wears any of

16 those, they wear khakis, they look like Dickies.

17          MR. KONTOS:  What we pled in the complaint is they

18 issued him different -- as a trustee, he was issued different

19 clothing and it was clothing that had no indication that he was

20 a prisoner and it aided his ability to go up to that door,

21 knock on it, and deceive the Longs, not to be invited.  If he

22 wore something that identified him as a prisoner, there is no

23 way they would have let him in, knowing that the jail is only a

24 mile away.  You can see the jail from their house.

25          THE COURT:  Isn't that a common law negligence

1  claim?

2            MR. KONTOS:  Not in this context.  We were talking

3  about what did the state do?  Isn't this just failing to act?

4  In addition to conference of the trustee status on him, the

5  state also did something affirmative by providing him with that

6  clothing, made that choice, it wasn't a failure to act.  It was

7  very significant that he had that clothing on.  This would not

8  have happened --

9            THE COURT:  Negligence includes taking affirmative

10  actions, it's not simply omissions.

11            MR. KONTOS:  But the negligence, Your Honor, the

12  idea there is when you talk about negligence, was it

13  deliberately indifferent to make that decision?  Was there that

14  level there to do it?  I would suggest to you that in this

15  context, it could be --

16            THE COURT:  Deliberately indifferent to who?  When a

17  jail guard punches somebody who beats them up, or there's

18  somebody in prison that has severe chest pains, they're obese,

19  they're 66 years old, they have cholesterol through the roof

20  and that person is laying on the floor clutching their chest

21  and the jail elects to do nothing, you say, okay, they're

22  deliberately indifferent to a guy who has every classic symptom

23  of a heart attack.  So who was the jail deliberately

24  indifferent to here?

25            MR. KONTOS:  Well, in this particular instance

1 talking about the clothing and the conference of trustee,

2 certainly to those identifiable victims that lived within

3 eyeshot of the jail.

4          THE COURT:  So, if I'm to say that there is -- that

5 Kneipp and Morse created daylight around Russell, I'm going to

6 have to write an opinion that defines the class that was

7 reasonably foreseeable and contemplated as being directly

8 likely victims of this, what is the class?

9          MR. KONTOS:  Well, do you have to define the class

10 in every instance?  The class in this instance, I would suggest

11 to you --

12          THE COURT:  I have to define it and then come to a

13 conclusion as to whether Ms. Long was in it.

14          MR. KONTOS:  Let's say this.  The fact that there is

15 a continuum in terms of what that class might be, the discrete

16 class, does not mean that it can't be done or shouldn't be

17 done.  In this particular instance, if you look at all the

18 facts, she is a resident that can see the jail, she lives

19 within the community of the jail.  So, to your point, where do

20 I draw the line, Counsel, is it people that live five miles

21 away, is it people that live ten miles away, 20 miles away?  I

22 don't know the answer to that.  But the fact that I don't know

23 the answer to that does not mean that in this instance it can't

24 be said that Tammy Long and her family were so close that they

25 would be within that ambient.  And I think a good example of

1 that --

2             THE COURT:  But I have to create a rule of law.

3             MR. KONTOS:  Your Honor, can I --

4             THE COURT:  I have to create a rule of law.  I have

5 to say in applying the third prong in what you say is the slit

6 in the wall that Kneipp created post-DeShaney, I have to have a

7 principle basis that I articulate as to what was the reasonably

8 foreseeable, discrete, defined class, and then I have to

9 determine whether Ms. Long was in it.  I don't think I have the

10 judicial luxury of saying, I know Long was in it, whatever it

11 is, she's in it.  That's not a principle judicial decision.  I

12 have to be able to write a decision that says:  Here is what

13 was foreseeable and is discrete and defined, and then make a

14 determination whether, as pled in the complaint, Ms. Long fits

15 within it.

16             So, I can't just say, I know she's okay.  I don't

17 have that luxury, Mr. Kontos.

18             MR. KONTOS:  Let me address that in two respects.

19             First, the Third Circuit in the Morse case analyzed

20 that issue and it relied upon, in great part, on the Reed case.

21 The Reed case was a situation in which there was a sober driver

22 and a drunk driver and the police pulled the person over.  They

23 removed the sober driver and they put the intoxicated driver

24 behind the wheel.  In that case, the court found that the

25 random motorists on that stretch of highway were foreseeable

1  victims of the state in that case.

2            Now, how far could that be?  Can we define that in

3  every instance?  The foreseeable victims under that analysis

4  could be from here to Philadelphia if the drunk driver had a

5  full tank of gas.  So what I'm saying is even though -- any

6  random motorist that passed that drunk driver on the road would

7  be a victim.  We don't know their names, we don't know if they

8  just happened to turn on the same highway --

9            THE COURT:  So, therefore, is the class here

10  anybody's home that Crissman would have gone to?  Is it anybody

11  Crissman had ever met in his life?  Is it any commercial

12  establishment Crissman had ever been in?

13            MR. KONTOS:  Of course not.  But is it -- does it

14  contain the nearby residents that are so close --

15            THE COURT:  How nearby?

16            MR. KONTOS:  I don't know exactly --

17            THE COURT:  A five-minute walk, ten-minute walk,

18  fifteen-minute walk?

19            MR. KONTOS:  All I know is you can see -- I stood on

20  Tammy's porch and you can see the jail from it.  You can

21  literally see the jail from it.  We have pled that in the

22  complaint.  So then is ten miles too long?  I don't know.  I

23  think what the courts have said in these situations is that

24  foreseeability is a touchstone and that if this is a

25  situation --

1          THE COURT:  Is there anything pled that Crissman had

2  ever met Ms. Tammy Long before?

3          MR. KONTOS:  Yes, as a casual resident.  I think she

4  was an acquaintance as it is pled in the complaint.  But I

5  would suggest that any resident within walking distance, within

6  eyeshot of the jail, he could have gone up to their door and

7  said, hey, I just -- I ran out of gas.

8          THE COURT:  Given that those are the facts in

9  Russell, don't I have to say that Morse and Kneipp implicitly

10 overruled Russell?

11         MR. KONTOS:  What are the facts in Russell?

12         THE COURT:  That it was somebody close to the jail

13 in Potter County.

14         MR. KONTOS:  Well, in Russell, we had an inmate, not

15 somebody that was given trustee status.  In Russell, which I

16 think is significant, did not have the framework or the rubric

17 that is now the modern, accepted approach post-Kneipp.

18         THE COURT:  I understand that, but you are saying I

19 have to write the opinion that denies Mr. MacMain's motion to

20 dismiss, I have to say that Kneipp, relying on DeShaney,

21 implicitly overruled or narrowed Russell.  And that while

22 Russell did not recognize that some subset of the general

23 public, that is, identified as people in the close proximity of

24 the jail is good enough, it is now.

25         MR. KONTOS:  I don't believe you have to do that,

1 Your Honor, with all due respect.  I don't think that you have

2 to somehow say that you're attempting to overrule Russell.

3           THE COURT:  Don't I have to say that Kneipp

4 overruled Russell --

5           MR. KONTOS:  No.

6           THE COURT:  -- in that regard?

7           MR. KONTOS:  No, I don't think that you have to.  I

8 think it's just understood that the analysis --

9           THE COURT:  The trustee stuff has nothing to do with

10 the zone of danger, that has to do with the shocks the

11 conscious.

12           I have to conclude that the decedent, Ms. Long, was

13 in a discrete, defined, in essence, zone of danger.

14           MR. KONTOS:  Yes.

15           THE COURT:  And that even though the decedent in

16 Russell was exactly similarly situated, had Russell been

17 decided after Kneipp, it would have come out differently.

18           MR. KONTOS:  I believe that it would.

19           THE COURT:  But that's what I have to say in the

20 opinion to hold your way.

21           MR. KONTOS:  I don't think that's overturning

22 anything.

23           THE COURT:  No, I can't overturn anything.  I have

24 to say Russell would have come out differently.

25           MR. KONTOS:  I think that you are free -- I don't

1 think that this is as much of a thread of the needle as Your

2 Honor suggests.  Maybe it is, but however big that space is, I

3 think that there is certainly plenty of guidance and analysis

4 that allows an analysis on the Kneipp standards, all four,

5 particularly with the third prong, to allow the Court to say

6 under these particular circumstances, taking all the cases that

7 we've talked about and particularly the Court's reliance in

8 Morse on Reed and the emphasis that it gave in that case, what

9 can be --

10          THE COURT:  To find no liability.  Reed found no

11 liability.

12          MR. KONTOS:  For a different reason, as with Morse.

13 It wasn't analyzing that prong.  But, certainly, Morse talked

14 about Reed and relied upon it in terms of what it thought was

15 the appropriate analysis.  Clearly in that case, it said that a

16 random motorist on the same highway, unknown, unidentifiable in

17 terms of who they might be could be a foreseeable, identifiable

18 plaintiff under the third prong.

19          THE COURT:  I'll ask my question again.

20          You're saying I have to write an opinion -- for you

21 to win, don't I have to write an opinion that says that if

22 Russell were decided today, given Morse and Kneipp, Russell

23 would come out the opposite way?

24          MR. KONTOS:  I mean to the extent that the Court

25 felt compelled to do it, it could do it.  There are many

1   dissimilarities.  Again, I would point out that in Russell, we

2   are talking about an inmate, just an inmate.  By its very

3   definition then you're talking about policy failures, you're

4   talking about lack of security, lack of --

5           THE COURT:  That goes to the shock the conscience

6   prong, that doesn't go to this identifiable victim prong, that

7   goes to shock the conscience.  That's how fundamentally stupid

8   were the people running the jail.

9           MR. KONTOS:  I also think it goes to the

10  foreseeability prong.  I think it does go to the identifiable

11  victim because if you're going to give this person access, what

12  might that person do?  Who is in danger as a result of that?

13          THE COURT:  But everyone is equally in danger, no

14  matter how the person gets out of the jail, whether they get

15  out of the jail because they were told they could go outside

16  the walls with food trays, whether they got outside the jail

17  because there were flimsy or no locks on the back door, once

18  they're out of the jail, then it's no more or less foreseeable

19  as to any potential victim.  That goes to the foreseeability of

20  how likely it is they're to escape.

21          MR. KONTOS:  Okay.  But getting back to Russell,

22  Russell didn't use the language or analysis that the courts now

23  use.  It just simply didn't do it.  It is literally an apples

24  and oranges kind of situation.

25          THE COURT:  What do I do -- I'm not the only

1  district judge roaming around the countryside here.  We have

2  Judge Harvey Bartle --

3            MR. KONTOS:  Let's talk about Henry.

4            THE COURT:  This is in Lipscomb.

5            MR. KONTOS:  Okay.

6            THE COURT:  He talks about complaint defining a

7  discrete class of people, in this case, police officers.  He

8  says:  To the extent Potteiger, Roderiguez, or Hernandez acted

9  to cause a danger as a result of Jones' presence on the street,

10 they caused a threat to the general population.  There's no

11 allegation that they did anything which made Jones a special

12 danger to a specific group such as the police, or that Jones

13 was more likely to cause harm to a discrete class of people

14 than to the public in general.

15           So, he's relying on Russell post-Kneipp, post-Morse

16 in 2013.

17           Henry is Judge DuBois.  That was affirmed by the

18 circuit, right?  That's a 2007 case.  Lipscomb is 2013.

19           If you look at Chief Judge Kane's decision in

20 Fleckenstein, she focuses on -- she says the complaint is rife

21 with allegations showing that Dowell had a relationship with

22 the state as a victim of a crime and that Sabol and the

23 probation defendants placed Dowell in danger of foreseeable

24 injury.

25           Specific acts of prior harassment, they were aware

1 of previous violent conduct toward the victim, no contact

2 orders as to the victim.

3          She goes through -- let's count the numbered

4 elements here -- six of them.  She cites to Martinez and says

5 rejecting plaintiff's claims stating parole board was not aware

6 that appellant's decedent as distinguished from the public at

7 large faced any special danger.

8          MR. KONTOS:  Well, Your Honor, there are numerous

9 cases.  Most of the cases that are cited in the defense brief

10 are parole cases and like Henry --

11          THE COURT:  Cite me one case from one district judge

12 anywhere post-Kneipp, post-Morse that says, here's a prisoner

13 case where it is an exception to Russell or Russell does not

14 apply.

15          MR. KONTOS:  I don't think that that is the standard

16 upon which the Court needs to rely.

17          THE COURT:  I agree, but it would be helpful.  It

18 would be helpful if you can point to one other -- if I'm

19 first -- there are times that I'm first, Mr. Kontos, and I'm

20 delighted to be first, I have written a surprising number of

21 opinions, surprising to me where I'm supposedly, apparently,

22 the first judge deciding something, but it would just be

23 helpful to me if you could point to one case involving a

24 prisoner, any type of prisoner post-Kneipp, post-Morse that

25 says Russell is not an impediment to this claim.

1          MR. KONTOS:  Well, the issue I would suggest is not

2  being first or second or whatever, it's being right, and I

3  think that --

4          THE COURT:  I'm happy to be right.  I spend all my

5  days, I spend most of the nights that I'm not sleeping worrying

6  about being right, Mr. Kontos.  I frankly don't need any lawyer

7  to tell me it's my job to be right.  I'm asking for some help.

8  I just need -- if you're telling me, Judge, it would be

9  terrific if I could point you to another district court

10  opinion, I'd do it, but there are none, you're flying first,

11  Judge.

12          MR. KONTOS:  I said that with respect, not as any

13  sort of an affront to the Court.  But I think that -- I think

14  there is precedent in the Third Circuit by which this Court

15  could find an actionable claim in this instance.

16          THE COURT:  I'll take that as a no, that you're

17  aware of no prisoner case post-Kneipp, post-Morse that said

18  Russell was not an impediment to the claim.

19          MR. KONTOS:  No trustee case where the state --

20          THE COURT:  Are you even aware of a prisoner case?

21          MR. KONTOS:  I'm not.  But I don't believe, again,

22  emphatically, that that in any way would not allow this case to

23  go forward.

24          THE COURT:  If I'm first, I'm first.  I'm happy to

25  be first.  I just wanted to make sure that you believe I would

1 be first?

2          MR. KONTOS:  As far as I know, you would be.

3          THE COURT:  Okay.

4          So, the special relationship here relates to the

5 geographic proximity of the residence Ms. Long lived in to the

6 jail, coupled with the enhanced likelihood that that could lead

7 to trouble because of at least the following affirmative

8 decisions of the jail leadership; the clothing that was issued

9 to and was worn by Crissman, and the decision in light of his

10 pled specific physical condition at the time he walked off on

11 tray duty as a heroin addict who had at least one crime that

12 involved violence toward property, that made her a foreseeable

13 and direct -- it made her a foreseeable victim of direct harm

14 caused by the state?

15          MR. KONTOS:  Yes.

16          THE COURT:  Okay.  I got it.

17          You may be right.

18          MR. KONTOS:  Thank you.

19          THE COURT:  Mr. MacMain, any rebuttal?

20          MR. MacMAIN:  I'll be very, very brief.  I think

21 Your Honor would be the first.  I think not only would you be

22 the first, but you'd have to --

23          THE COURT:  I have been the first in a number of

24 things.  I don't look for those opportunities, but if I have no

25 choice, I'm happy to be first.

1          MR. MacMAIN:  I think you have to additionally, as

2   you indicated, indicate Russell would be decided differently.

3   Russell talks of the very thing that we have been primarily

4   focused on, that is the zone of danger.  The Third Circuit said

5   just living near the prison isn't enough, that one could argue

6   if you escape from the prison, you want to get away from the

7   prison as far as possible, so victims two miles away -- people

8   who live two miles away could be equally in the zone of danger,

9   five miles away.

10          THE COURT:  What do you do with Mr. Kontos saying

11   Morse, even though Reed is a Seventh Circuit case, Morse cited

12   favorably to and relied on Reed, and Mr. Kontos says, Judge,

13   that while you can state the definition, that is, other

14   motorists operating on the highway, depending on the time of

15   day and the highway, that could be 20 people, it could be 200

16   people, it could be 20,000 people, but that didn't get in the

17   way of Reed saying those other motorists were in the

18   foreseeable zone of direct harm, and then Morse cited favorably

19   to Reed.  What do you do with that?

20          MR. MacMAIN:  Well, I think, first of all, the facts

21   are very different.  We have a whole body of case law talking

22   about these facts, prisoners, parolees.  I think this case and

23   the one you cited from Chief Judge Kane out of the Middle

24   District, if you had a scenario where the crime victim lived

25   near -- the victim of the inmate's violence lived near the

1  prison and they said, I have received letters that this inmate

2  is going to escape and kill me, and all these other things

3  happened, it gets very, very specific to this person, I think

4  that might be the case that would be different than Russell and

5  the Middle District case and Judge DuBois' opinion and Judge

6  Bartle's opinion, they would be facts that might support

7  distinguishing it from Russell and the whole body of case law

8  that has developed.  But this case isn't that.  She lived near

9  the prison.  It's unfortunate and tragic that it happened, but

10 it doesn't make her in the zone of danger or there's no special

11 relationship or, really, special duty, I think is probably

12 another way to say it.  So I think for all the reasons that

13 we've already discussed, I think as a matter of law, judgment

14 needs to be entered and the complaint dismissed in favor of the

15 defendants.

16          THE COURT:  Thank you, Mr. MacMain.

17          Mr. Kontos, let me ask you this, sir.

18          Does Ms. Long, the plaintiff, and the Tammy Long

19 Estate, do they have state law claims?

20          MR. KONTOS:  Not that I know of.

21          THE COURT:  Because of the municipal governmental

22 immunity, the Political Subdivision Torts Claims Act?

23          MR. KONTOS:  Yes.

24          I just want to note one last thing with respect to

25 the last exchange.  I will be very brief.

1            Russell didn't have Morse, didn't have that ability

2   to use that case and that analysis from Reed, and I think that

3   that --

4            THE COURT:  So effectively, I would have to say if

5   Russell, at least at the motion to dismiss stage, if Russell

6   was here, if we had the Russell case and you two gladiators for

7   the parties here in the Russell case today, your argument,

8   among other things, would include, Judge, Morse and Kneipp say

9   you can't grant the motion to dismiss, we've pled enough, given

10  Morse and Kneipp from this circuit to get to the next level of

11  the litigation.

12           MR. KONTOS:  Yes.

13           THE COURT:  Okay.  It's okay to say that.

14           MR. KONTOS:  Good.  Thank you.

15           THE COURT:  We'll figure out who is right or wrong,

16  but I think that's the necessary implication of your argument.

17  If we flip the calendar and if we made Russell come after Morse

18  and Kneipp, I think a necessary implication of the plaintiff's

19  argument is Russell would come out differently, at least in

20  terms of stating a claim at the motion to dismiss stage.

21           And Mr. MacMain, I think your argument is, A, Morse

22  and Kneipp don't change Russell, but B, whatever court has the

23  power to say that, it isn't this one.

24           MR. MacMAIN:  I'm not sure I'd say that last point.

25  I would say that there have been other district court judges

1  that have had, in essence, the same question posed and rejected

2  the judgment; Judge Kane, Judge DuBois, Judge Bartle.  Again, I

3  haven't seen any -- I think you asked counsel this, there's not

4  a single case --

5             THE COURT:  I may be first.

6             MR. MacMAIN:  There's not a single case that has

7  been adopted.

8             THE COURT:  The first to have to address this

9  precise question in this precise way.

10            MR. MacMAIN:  I don't know.  I think Judge Kane,

11  Judge Bartle, and Judge DuBois have already addressed the very

12  same question.  This would be affirmative in favor of the

13  defendants that it doesn't change the law, the principle is

14  still the same.  You can't just have this amorphous zone of

15  danger because there is no way to define it.  I think if you

16  had facts where there was a specific person, where there were

17  threats made, that there was a whole series -- that's even --

18            THE COURT:  Don't judges all the time say, they

19  write something that goes like this, while we're not in a

20  position to identify for all cases and in all situations the

21  precise contours of the liability or the right in question

22  here, we can't say with confidence that this falls within it.

23  I mean it's sort of addressed that way reverting back to

24  Justice Stewart's observation, he knows it when he sees it.

25            MR. MacMAIN:  Right.

 1                    THE COURT:  Mr. Kontos, anything else, sir?

 2                    MR. KONTOS:  No, Your Honor.  Thank you.

 3                    THE COURT:  Ms. McGee?

 4                    MS. McGEE:  No, Your Honor.

 5                    THE COURT:  Mr. MacMain, anything else you'd like to

 6  say?

 7                    MR. MacMAIN:  No, Your Honor.

 8                    THE COURT:  Mr. Zimmerman, anything that we wanted

 9  to go over with counsel that got left unaddressed?

10                    MR. ZIMMERMAN:  Nothing further, Judge.

11                    THE COURT:  The Court is very appreciative of the

12  briefing in this case.  I found it to be complete, thorough, to

13  the point, and completely avoiding the lengthiness that often

14  appears in other briefs that we see.  You framed the issue, I

15  think it's a very focused and precise issue.  We're going to

16  have to go back and take the case law that everyone cited, read

17  them again in the context of the points you made in argument

18  today.  We'll get a decision out as promptly as we can.

19                    Mr. MacMain, any other business you think we ought

20  to take up today while we're all here?

21                    MR. MacMAIN:  No, Your Honor.

22                    THE COURT:  Mr. Kontos or Ms. McGee?

23                    MR. KONTOS:  No, Your Honor.

24                    THE COURT:  You can adjourn the Court.

25          (Court adjourned.)

1

2

3                              <u>CERTIFICATE</u>

4

5          I, Juliann A. Kienzle, certify that the foregoing is
a correct transcript from the record of proceedings in the
6 above-titled matter.

7

s/Juliann A. Kienzle, RMR, CRR
8 _____
Juliann A. Kienzle, RMR, CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25